Missouri Pacific Railroad Company, Thompson, Trustee, v. Carruthers, Admr.

4-6648                                            162 S. W. 2d 912

Opinion delivered June 1, 1942.

*Henry Donham* and *Pat Mehaffy,* for appellant.

*W. F. Denman* and *W. R. Donham,* for appellee.

McHANEY, J.   Appellee is the administrator of the estate of James K. Carruthers, deceased, who was instantly killed in a collision with the first section of train No. 2, the Sunshine Special, at the Elm street crossing, in Prescott, Arkansas, on the night of November 11, 1940, at about 9:45 p. m.   He brought this action against appellants, the railroad company, its trustee in bankruptcy and the engineer on said train, John T. Griffin, to recover damages therefor.   The negligence alleged in the complaint and relied on at the trial was failure to sound the whistle or ring the bell, and "that the headlight on the engine—was defective, in that same was very dim, if in fact the headlight was burning at all, and alleges that it could not be seen at a safe distance by travelers upon said Elm street as was the deceased"; damages were prayed in a large sum both for the benefit of the widow and children of deceased, and for the benefit of his estate; for conscious pain and suffering.   The answer was a general denial and a plea that the death of deceased was caused by his own negligence and carelessness in driving upon the track in front of said train without exercising any care for his own safety and protection; that said Elm street crossing is equipped with an electric gong and wig-wag signal in the center of Elm street, which gong was sounding and the wigwag working warning him of the approach of said train; that notwithstanding said warning, and without looking or listening and without stopping, or without exercising any degree of care, he drove his car onto the track immediately in front of said train, causing it to strike him, at a point and under such conditions that it was impossible for the operatives to avoid striking him, and that his own negligence and carelessness was the direct and proximate cause of his injuries and death.   Trial resulted in a verdict and judgment against appellants in the sum of $20,000.

The facts most favorable to appellee and the undisputed facts disclose that appellee's intestate was driving his car north on highway No. 67, which parallels the main

line railroad track through Prescott and is 110 feet west of said track; that at the intersection of said highway and Elm street there is a traffic light with red and green signals to control traffic; that, on reaching said intersections, intestate turned to his right without stopping and proceeded east to cross the railroad track, driving at a rate of speed of 15 to 20 miles per hour; that, immediately west of the main line of railroad, there are two switch tracks that come to a dead end at or near Elm street, both having box cars spotted on them in such close proximity to Elm street as to obstruct the view of one approaching the main line from the west until such obstruction was passed; that there is also located west of said switch tracks and south of Elm street a loading platform and freight depot which obstruct the travelers' view to the south; that there is located, in the middle of Elm street and just west of the main line an electric gong and wigwag signal to warn persons using the crossing of the approach of trains; that at the time intestate was struck and killed the gong was sounding and the wig-wag signal was working and that he had to pass same, within a few feet of it, to get on the main line track; that it is 18 feet between the end of the ties on the main line and the end of the ties on the first or No. 1 switch track to the west; that there was a freight train on a passing track south of the crossing, which is east of the main line, waiting for No. 2 to pass before pulling out, and escaping steam from its engine was making some noise; and that this passing track is 136 feet south of the Elm street crossing. Appellant's witness, Fielding, testified it was 38.8 feet from the center of the main line track to the center of side track No. 1. Mr. Boyette, signalman for appellant, testified, and was not disputed, that when a train hits the electric circuit 2,000 feet south of the crossing on the main line, it starts the gong ringing and the wig-wag working, and that, for the freight train on the passing track to cause the gong to ring and the wig-wag to work, the switch to the main line has to be open and we understand that to mean it has to be lined up with the main track so as to divert a train from the main line to the side track or from the side track to the main line. In other words, the circuit that works the gong and wig-

wag is wired to the main line, and that a train on the side or passing track would not work the signals unless there was actual contact between the rails of the side track and the rails of the main line. That there was no such contact is conclusively demonstrated from the fact that train No. 2 proceeded along the main line past the switch stand. Had the switch been open it would have wrecked No. 2, which was running about 50 miles per hour. It necessarily follows that the local freight on the passing track did not cause the gong to ring and the wig-wag to work at the time intestate was killed, but that it was caused by No. 2 on the main line.

Five witnesses testified for appellee to the effect that train No. 2 did not whistle for the Elm street crossing, but that it did whistle down about the depot, south of this crossing, and one of them that the bell was ringing. Three of them said the headlight was not burning when the accident occurred. Witness Silas said he didn't think it was burning and Gee said it was out when it hit the car, but when he first saw the train, the headlight was on, and he thought it went out about the depot. Stockton said he never saw a train run without a headlight before. All five witnesses say No. 2 was making a lot of noise that could be heard a long distance away and that the gong was ringing and the wig-wag working.

Opposed to this evidence of appellee, appellants offered the testimony of 12 witnesses, in no way connected with it, who testified positively either that the bell on No. 2 was ringing or that the whistle was blowing and that the headlight was burning, although it had been dimmed so that the operatives on the local freight could see its signals. In addition to appellant Griffith, the engineer on No. 2, nine other employees of the railroad company testified in corroboration of the 12 non-employees. It thus appears that there was some conflict in the evidence as to whether the signals were given for this particular crossing, but there seems to be little, if any, conflict in the evidence that the whistle blew down about the passenger depot which was some two blocks south of Elm street. One of appellee's witnesses, Silas, made a statement to the claim agent on November 14,

1940, three days after the accident, which was taken by the official court reporter, in which he said the train whistled before he saw it, at least as far south as the passenger depot, and that it continued to whistle almost constantly up to where the accident happened. As to the headlight, the complaint did not allege it was not burning, but that it was defective in that it was very dim, and could not be seen at a safe distance. The overwhelming proof shows, not only that the signals were given, but that the headlight was burning, although it had been dimmed to enable the waiting crew on the local freight to see its signal lights which indicated that another section of No. 2 was following this train, and the engineer said he blew a classification signal at the local engine to attract their attention to his signal he was carrying for the second section. He said that, to dim the headlight, there is a switch in the cab and it is thrown off the headlight with several hundred candle power and put on the hundred candle power, so the local crew could see his classification, and then switched back on the high candle power, and that was what he did. No doubt this dimming of the high light caused some three of the witnesses to think the headlight had gone out.

But regardless of whether the signals were given or the headlight was temporarily off, all the witnesses agree that this train was traveling at about 50 miles per hour and was making a very loud noise, that could be heard for a mile or more down the track. We think this case is ruled adversely to appellee by the very recent case of *Mo. Pac. Rd. Co.* v. *Howard, ante,* p. 253, 161 S. W. 2d 759.

Appellee's intestate was grossly negligent in driving upon the tracks, under the circumstances here presented, in total disregard of the ringing gong and the working wig-wag, which cried out to him, in no uncertain terms, that danger was approaching. Even though his view was obstructed to the south, the direction from which No. 2 was approaching, the duty was imposed upon him to approach said crossing with greater caution, especially in view of the warning signals staring him in the face and beating upon his sense of hearing. In the Howard case, *supra,* we said: "The very fact that box cars were spotted

so near the crossing, as to cut off the view to the south, made it her duty, in the exercise of due care, to approach the main line track in such a way as to permit her to get a clear view to the south after the box cars ceased to obstruct her view and to stop, if necessary, to avoid the danger. In other words, as the danger increases, the degree of care required to free one of contributory negligence in a crossing accident increases.'' See cases there cited to support that statement. We there held that the contributory negligence of Howard equalled or exceeded that of the railroad company, conceding it to have been negligent for failure to give the signals, and that there could be no recovery under the provisions of § 1213 of Pope's Digest. The statute, § 11135 of Pope's Digest requires railroad companies to ring the bell or blow the whistle at crossings, that is, to do one or the other, beginning 80 rods away, and to continue until the crossing is passed. We have held in many cases that these statutory signals cease to be factors and that no recovery can be had for failure to give them when the presence of the train is plainly discoverable by other means, the latest being the Howard case. Here, not only did the warning signals in the middle of Elm street give intestate this information, but the loud noise of the train could have been heard by him, had he used the slightest care. Either he saw and heard these signals and the noise of the approaching train and thought he could beat it across, or he was preoccupied with something else and failed to see and hear what was plainly to be seen and heard and what every one else saw and heard, including his own witnesses. In either case, there can be no recovery, because his own negligence was the proximate cause of his death.

We conclude, therefore, that intestate's negligence, under the circumstances here presented, equalled or exceeded that of appellants, assuming them to be negligent as stated, and that the judgment should be reversed and the cause dismissed.

MEHAFFY, J., not participating.

SMITH, J., (dissenting). The majority correctly say that there can be no recovery if the negligence of the deceased was equal to or greater than that of the em-

ployees of the railroad company. Both were negligent, but, in my opinion, the respective degrees of negligence was a question for the jury, and I, therefore, dissent from the judgment dismissing the cause of action. The jury might well have found that the negligence of the deceased was greater than that of the operatives of the train; but that finding was not made.

However, I think it certain and undisputed that deceased was negligent, but, in my opinion, the jury did not take that fact into account. The wigwag was working, but the warning which it gave was disregarded. Certainly this was negligence, and the statute (§ 1213, Pope's Digest) provides that "where such contributory negligence is shown on the part of the person injured or killed, the amount of recovery shall be diminished in proportion to such contributory negligence."

If this statute is applied and given effect, the judgment for $20,000 cannot be sustained, and should be materially reduced. In my opinion, under the undisputed evidence, the judgment should be materially reduced, although the cause should not be dismissed.

Humphreys, J., (dissenting). The majority correctly say that there can be no recovery if the negligence of the deceased was equal to or greater than that of the employees of the railroad company. The majority in the last analysis of the testimony conclude that intestate's negligence equaled or exceeded that of appellants, and that the judgment should be reversed and the cause dismissed. This was not the conclusion of the jury. The jury analyzed the evidence and concluded by their verdict that appellants' negligence was greater than that of deceased. There is substantial evidence in the record tending to support the finding of the jury, and the verdict should not be stricken down by the court unless there is evidence showing that the verdict was the result of passion or prejudice. There is nothing in this record showing that the verdict was based upon passion or prejudice. The jury are better judges of the weight and effect of the testimony of witnesses than the court can possibly be. In fact, the Constitution of this state makes the jury

the exclusive trier of the facts. No authority is conferred upon the Supreme Court to try the facts *de novo* in a suit at law. In chancery suits, the court may do so, but not in suits at law. In my opinion, the majority of the court in striking down the verdict and dismissing the suit invaded the exclusive province of the jury.

In his dissenting opinion Mr. Justice Smith says that the majority erred in striking down the verdict and dismissing the suit, and that instead of doing so the court should have diminished the verdict in proportion to the deceased's contributory negligence under § 1213 of Pope's Digest. In his dissent he states that the jury did not take the fact of deceased's contributory negligence into account. I am at a loss to understand why he concludes that the jury did not take deceased's contributory negligence into account in arriving at their verdict. Whatever contributory negligence deceased was guilty of was before the jury, and the presumption necessarily is that they took it into consideration in arriving at their verdict. It was the duty of the jury to take any contributory negligence on the part of the deceased into consideration, and I cannot agree with my learned associate that they did not take it into consideration. I not only dissent from the majority opinion, but dissent from that portion of my associate's dissenting opinion which says that the court should have materially reduced the verdict instead of striking it entirely down. There is nothing in this record showing that a verdict for $20,000 is excessive, even though the deceased was partially to blame for the collision.

For the reason given, I most respectfully dissent from the majority opinion in this case.