Mrs. Lillian **OVERSTREET**, Plaintiff,

v.

**MISSOURI PACIFIC RAILROAD COMPANY**, Defendant.

Civ. A. No. 1579.

United States District Court
W. D. Arkansas,
Fort Smith Division.

July 6, 1961.

Daily & Woods, Fort Smith, Ark., George W. Leopold, Muskogee, Okl., for plaintiff.

Harper, Harper, Young & Durden, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This suit was commenced March 3, 1961, by the plaintiff, Mrs. Lillian Overstreet, to recover damages for personal injuries received by her on August 5, 1959, while she was a passenger in an automobile being driven by her husband, C. A. Overstreet, Sr., which automobile was struck by a Diesel locomotive of the defendant at a grade crossing in the City of Fort Smith, Arkansas.

In numbered paragraphs 6 and 7 of the complaint, the plaintiff alleged:

"6.

"That the driver of the automobile in which plaintiff was riding as a passenger proceeded north onto the south edge of the 'defendant's crossing' in the course of crossing the same, at which point the motor of the plaintiff's automobile failed and stopped and it stalled on the south edge of the 'defendant's crossing', and on the east side of Towson Avenue. That at this time a train belonging to the defendant and operated by its agents, servants and employees was approaching the 'defendant's crossing' from the north northwest at a substantial distance from said crossing, and was being negligently operated in the manner hereinafter particularly alleged. That the defendant's said train continued onto the 'defendant's crossing', without slackening its speed, and while the plaintiff's automobile was stalled at the southeast corner thereof, striking the plaintiff's automobile with great force and violence.

"7.

"The aforesaid collision of the defendant's train with the plaintiff's automobile was solely and proximately caused by the negligent acts and omissions of the defendant on the part of its agents, servants and employees operating said train, in the following particulars:

"(a) Failure to keep a constant lookout for persons and property upon the defendant's track at 'defendant's crossing,' as the defendant's said train approached the same, as required by the statutes of Arkansas, whereas if such duty had been discharged by the persons operating said train the peril of the plaintiff would have been discovered in time to have avoided the collision.

"(b) Operating the defendant's train over its branch line across a public crossing at a time when the bell was not being rung or the whistle blown, as required by the statutes of Arkansas.

"(c) After discovering the plaintiff's peril, or after they could and would have discovered same had they discharged their duty as set forth in subparagraph (a) above, the de-

fendant's agents, operating said train, negligently failed to stop the same in time to avoid the collision, although they had ample time and space in which to do so.

"(d) After discovering the plaintiff's peril, or after they could and would have discovered same had they discharged their duty as set forth in subparagraph (a) above, the defendant's agent, operating said train, negligently failed to apply the brakes thereof and slow its speed and thereby minimize the force of the collision between the defendant's train and the plaintiff's automobile and thereby avoid the serious and permanent injuries resulting to the plaintiff from such collision, as hereinafter alleged, although they had ample time and space in which to do so.

"(e) Under all of the facts and circumstances attending at the time and at the place of the 'defendant's crossing', which were well known to the defendant through its agents, servants and employees, or should have been well known to it in the exercise of ordinary care on the part of its agents, servants and employees, it was grossly negligent in operating its train across 'defendant's crossing' without maintaining a flagman at said crossing to warn motorist lawfully using the public highways at that point, and particularly this plaintiff, of the dangers and perils there existing.

"(f) In operating the defendant's train in the City of Fort Smith as it approached and entered a crossing of a busy public thoroughfare at an unlawful, high and dangerous rate of speed."

Following the above allegations, the plaintiff alleged specifically the personal injuries received by her; the amount of the medical, surgical, hospital, nursing and drug bills incurred by her; and prayed for judgment against the defendant in the amount of $250,000.

On March 21, 1961, the answer of the defendant was filed in which the defendant admitted that a collision occurred on August 5, 1959, at approximately the time and place alleged in the complaint, but denied that at the time the collision occurred that the plaintiff and her husband were each exercising due care for their own safety and for the safety of others; and denied that the crossing of its tracks over Towson Avenue in the City of Fort Smith at the place described in the complaint was one of extreme danger and hazard to occupants of motor vehicles traversing Towson Avenue.

The defendant admitted that the automobile in which plaintiff was riding stopped at the south edge of defendant's tracks on the east side of Towson Avenue and at the time a train belonging to defendant and operated by its employees was approaching Towson Avenue from the northwest, but denied that the train was being negligently operated; that the employees operating its train failed to keep a lookout for persons and property on the track at the crossing in question, and that plaintiff was discovered by them in time to have avoided the collision. The defendant further denied that the employees were operating said train across a public crossing without ringing the bell or sounding the whistle as required by law, and that after discovering plaintiff's position, they negligently failed to stop said train in time to avoid the collision and denied "they had ample time and space in which to do so."

In numbered paragraph 7 of the answer the defendant stated:

"7.

"Defendant denies that the employees operating said train, after discovering plaintiff's position, negligently failed to apply the brakes of the train or to slow its speed, and denies that they had ample time and space in which to do so, and denies that they could have avoided or minimized the force of the collision between defendant's train and the automobile in which plaintiff was riding and thereby have avoided in-

juries to plaintiff. Defendant denies that it was grossly negligent in operating its train across the crossing in question without maintaining a flagman at that point, and affirmatively states it was not required either by law or by the exercise of ordinary care to do so. Defendant denies that as its train approached said crossing it was being operated at an unlawful, high and dangerous rate of speed."

In numbered paragraphs 11, 12, 13, and 14, the defendant alleged:

## "11.

"Further answering, defendant states that as its train approached the crossing in question the employees in charge of operating the same were keeping a constant lookout for persons and property upon the track ahead, as required by law, and that said train was being operated with the exercise of ordinary care and at a reasonable and careful rate of speed, and that as the same approached said crossing the bell on the locomotive had been and was being sounded in the manner provided by law and in the exercise of due care. Defendant further states that at the crossing in question, and at the time alleged in the complaint, there was installed and in operation at said crossing two sets of automatic flashing lights, each set consisting of two flashing lights facing in each direction, that is north and south, so that each set of said lights contains four flashing lights, two facing in each direction. One set of said lights was located immediately north of defendant's tracks and immediately south of defendant's tracks and immediately east of Towson Avenue, and both sets were plainly visible to the driver of the automobile in which plaintiff was riding, and to the plaintiff, as the same approached said crossing. Said flashing lights were in working order and in good condition, and as defendant's train approached said crossing and at a great distance therefrom the said flashing lights and a bell located thereon commenced operating, sounding a warning, with said lights flashing red both to the north and south on both sides of Towson Avenue at a time when the automobile in which plaintiff was riding was far enough away from said crossing to have observed the same and to have taken notice that a train was approaching, and plaintiff and the driver of the automobile in which she was riding were thus warned of the approach of said train, not only by the sounding of the whistle and the bell thereon but by the operation of said flashing lights and the bell thereon, in ample time for them to have avoided going onto said crossing at danger to themselves. That notwithstanding the operation of said lights facing toward them on both sides of said track and the sounding of said other signals as aforesaid, plaintiff and the automobile in which she was riding continued to approach said crossing, in disregard of said warning signals, and thereby plaintiff and the driver of said automobile failed to exercise ordinary care for their own safety in going onto and stopping same at the edge of said tracks, thereby exposing themselves to danger, although they knew said crossing was there and knew, or by the exercise of ordinary care on their part could have known, that a train was approaching thereon, and because of her failure to exercise ordinary care in that regard plaintiff was guilty of contributory negligence sufficient to bar a recovery on her part.

## "12.

"Further answering, defendant states that it was the duty of plaintiff to keep a lookout and to exercise ordinary care for her own safety, and in failing to do so she was further guilty of contributory negli-

gence sufficient to bar a recovery on her part.

"13.

"Further answering, defendant states that when its employees operating said train first knew and became aware, and when they first could have known or become aware, that the occupants of said automobile had disregarded the warning signals aforesaid and had proceeded toward said track and had stopped at the edge thereof, the engineer in charge of said train immediately applied his emergency brakes in order to check the speed thereof and bring the same to a stop as rapidly as possible and that said train was stopped as quickly as it was humanly possible to do so under the circumstances.

"14.

"Further answering, defendant states that even if the plaintiff was not guilty of contributory negligence as aforesaid, her injuries were caused wholly, solely and proximately by the negligence of her said husband, in failing to keep a lookout, in disregarding the flashing lights, the sounding of the whistle and bell of the engine and the sounding of the bell at the crossing, and in attempting to cross over the same in the face of said warnings, when he well knew, or should have known, that a train was approaching and in stopping or stalling his automobile in a place of danger and at a time and place when it was physically impossible for defendant's employees to avoid striking the said automobile under any circumstances."

On April 3, 1961, an amendment to the answer of the defendant was filed, and in numbered paragraph 15 of the amendment to the answer, the defendant alleged:

"15.

"Defendant states that plaintiff and the operator of the automobile in which she was riding, as alleged in the complaint, were further guilty of contributory negligence in violating Section 75–637, Arkansas Statutes, 1947, Annotated, as amended by Section 28 of Act·307 of the Acts of Arkansas for 1959, in that although at the time and place alleged in the complaint there was in operation a clearly visible electric mechanical signal device giving warning of the immediate approach of defendant's train, they failed to stop said vehicle or cause the same to be stopped within 50 feet but not less than 15 feet from the nearest rail of such railroad crossing."

The cause was tried to the court without a jury on June 15 and 16, 1961. At the conclusion of the testimony, the case was submitted, and the attorneys for the parties were requested to file written briefs and arguments in support of their respective contentions. The briefs and arguments have been received and considered along with all of the testimony and exhibits thereto, and the court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

Findings of Fact

1.

The plaintiff, Lillian Overstreet, is a citizen of the State of Oklahoma, and she and her husband, C. A. Overstreet, Sr., reside on a ranch situated approximately nine miles west of the City of Spiro, Oklahoma.

The defendant is a corporation organized under the laws of the State of Missouri with its principal place of business located in the City of St. Louis, Missouri, and is now and was on August 5, 1959, engaged in business in the Western District of Arkansas.

The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs.

2.

The plaintiff and her husband, C. A. Overstreet, Sr., have been married 59 years. On August 5, 1959, she was 75 years, 8 months, and 17 days of age. Her husband was approximately 79 years

of age, and on that date they left their ranch home to drive to the City of Fort Smith, Arkansas, where the husband was to consult a physician, and the plaintiff was to do some shopping. Upon their arrival within the corporate limits of the City of Fort Smith, they entered upon U. S. Highway 71, which is also Towson Avenue, and proceeded north. They were familiar with the route, having traveled it many times during the last several years.

At the place where the collision occurred, Towson Avenue runs north and south and is intersected by South Fresno Street, sometimes referred to as Highway 22–T. The railway of the defendant crossed the intersection of Towson Avenue and South Fresno Street from the northwest to the southeast.

Towson Avenue has four lanes of travel. The pavement is 45 feet wide, and the avenue is 70 feet wide. South Fresno Street is not as wide as Towson Avenue.

The defendant's train was traveling from the northwest in a southeasterly direction. The track crossed the west line of Towson Avenue a few feet north of the north line of South Fresno Street, thence over the intersection and left Towson Avenue at a point a few feet south of the south line of South Fresno Street. In other words, the railroad enters the intersection a few feet north of the northwest corner of the intersection and leaves the intersection a few feet south of the southeast corner. Flasher light signals are situated on a white steel pole 6 feet from the west side of Towson Avenue and 25 feet north of the railroad. There are four red lights, two facing south and two facing north, and immediately under the lights facing north is a sign containing the words "Stop on Red Signal."

Six feet from the east line of Towson Avenue and 25 feet south of the railroad is a similar sign equipped with six red lights, two facing south, two facing north, and two facing northeast towards the extension eastward of South Fresno Street. Also under the red lights appears the same sign, "Stop on Red Signal."

On both poles appear the usual railroad crossing signs, and also on the top of the signal pole situated on the east side of Towson Avenue bells are installed which begin ringing when the lights begin flashing. The lights are on a circuit which is actuated by the passage along the track of any non-insulated vehicle, such as a locomotive or railroad car. The signals thus automatically begin flashing when a train or engine approaches within a distance of 1,200 to 1,400 feet of the crossing and continue to flash red until the crossing has been cleared by the train or locomotive.

The red signal lights were flashing and the bells were ringing prior to and at the time the plaintiff and her husband approached the railway from the south. The weather was clear and warm, and the pavement was dry.

The train had passed over several crossings prior to approaching the crossing where the collision occurred, and because of the proximity of the various crossings, the whistle on the train had been sounded at various times during the last three-quarters of a mile traversed prior to reaching the crossing. The bell on the locomotive was ringing and had been ringing constantly during the last three-quarters of a mile. The train was making 22 miles per hour when it approached the crossing, and was clearly visible for a distance of at least 800 feet northwest to anyone approaching the crossing from the south.

3.

Towson Avenue is one of the most traveled thoroughfares in the City of Fort Smith, and notwithstanding the fact that the collision occurred about 11:30 a. m., yet the traffic was fairly heavy even at that hour.

The testimony does not reveal the speed at which Mr. Overstreet was driving as he and the plaintiff approached the crossing, but as he approached the crossing, the motor of the automobile ceased to function, or stopped running,

probably because of abrupt application of the brakes by the driver. The automobile stopped with the right front wheel either on or very near the south or southwest rail of the railroad. (It will be borne in mind that the railroad crossed the intersection in a northwesterly and southeasterly direction, and that the automobile was proceeding due north, so that the right front wheel of the automobile would reach the rail before the left wheel did.)

Apparently Mr. Overstreet, the driver of the automobile, attempted to start the motor, but for some reason was unable to do so. At that time the train was either entering or was within a few feet of the entrance to Towson Avenue. It was not more than 100 feet from the automobile. Some part of the locomotive struck the right front end or bumper of the automobile and knocked it to the east and south a distance of approximately 40 feet, where it came to rest on the east side of Towson Avenue headed in a westerly direction.

### 4.

The fireman on the locomotive was sitting on the left side as the train was traveling toward the crossing. He was occupying the seat usually used by firemen, but did not have a clear view of the crossing because of two freight cars that were standing on a side track which extended from the northwest to a point near the west line of Towson Avenue. The fireman could see and did see cars approaching the crossing from the south until the locomotive moved closer to the crossing, when his view was shut off because of the extension of the locomotive forward from the seat occupied by him.

The engineer on the locomotive was sitting in the usual place on the right-hand side, and from that position he could and did clearly see the crossing when the engine was 800 feet northwest of the crossing. Prior to reaching the 800-foot point, he could see automobiles and other vehicles south of the crossing traveling north along Towson Avenue. He first saw the automobile that was being driven by Mr. Overstreet when it was approximately 300 to 350 feet south of the crossing. The automobile along with other vehicles was proceeding north, and the engineer assumed that the automobile driven by Mr. Overstreet would stop before crossing the railroad. When the locomotive had reached a point approximately 70 feet from the point of impact, he observed that the automobile had stopped, and by the time he was within 20 or 30 feet of the stopped automobile, he observed that the front right wheel was either on or near the south rail of the track. He applied the brakes as soon as he observed that the automobile had stopped on the track, but at that time the locomotive was within 10 or 12 feet of the stalled automobile. It requires 9 seconds after the application of the brakes for them to become effective. The train struck the automobile and proceeded down the tracks in a southeasterly direction a distance of 250 to 300 feet before stopping, which was the shortest distance in which the train could have been stopped after the automobile stopped on the track.

### 5.

The engineer, conductor, and brakeman on the train were thoroughly familiar with the crossing, having passed over it many hundreds of times, if not thousands of times. Their regular run was from Van Buren, Arkansas, to Paris, Arkansas, a distance each way of 56 miles. They made the round trip six days each week and, of course, passed over this crossing twice each day in traveling the 112 miles. On the day the collision occurred, the train consisted of a locomotive and 29 or 30 cars. Three of the cars were loaded, the remainder were empty, and the locomotive was pulling approximately 900 tons of weight. The brakes were in excellent condition, the bell on the locomotive was ringing continuously, and the whistle was sounding if not continuously, practically continuously, and had been for the last three-quarters of a mile traveled by the train. The signal lights were flashing and the signal bells were sounding. The automobile stopped on or near the south rail

of the track at a time when the train was within a very short distance, not exceeding 60 or 70 feet, and it could not be stopped by the application of brakes at the speed at which it was traveling before striking the automobile, but the train was not running at an unusual rate of speed.

The court is convinced that the engineer was maintaining a constant lookout for persons and property upon the track as it approached the crossing, and had been maintaining such lookout during a distance of at least 800 feet. The testimony does not reveal any facts or circumstances that would indicate to the engineer or anyone else in charge of the train that the driver of the automobile would fail to stop until the train passed over the crossing.

### 6.

The plaintiff, Mrs. Lillian Overstreet, on direct examination testified that she didn't remember very much of what happened as she and her husband were approaching the crossing from the south going north; that she was looking at the men and a pile of dirt situated on her left as they approached the crossing. (In speaking of the men who were working and the pile of dirt, she had reference to some employees of a gas company who were engaged in laying a gas line along the south side of South Fresno Street, and who had made an excavation in the street at a point west of the intersection of South Fresno and Towson Avenue upon which she was traveling. Immediately east of the excavation and west of the west line of the intersection, the men had placed wooden barricades and closed South Fresno Street to traffic going west from the intersection.)

She did not see the red flashing lights, warning of the train's approach. Mr. Overstreet stopped just about at the crossing. She did not remember whether she had seen the train approaching before Mr. Overstreet applied his brakes and stopped. About the time Mr. Overstreet stopped the automobile, she saw the train. She did not know whether Mr. Overstreet made any effort to move from the track where he had stopped. She guessed that he killed the motor of the automobile when he saw the train because he put on his brakes at that time.

"Q. And at that time was the train up northwest on the tracks coming toward you? A. Yes, I guess it was up there.

"Q. Did you watch it approach? A. Well, yes, I saw it. It was right close to us. Not very far. I couldn't tell you how far away it was. I was looking at those folks out in the street, I guess, and the pile of dirt.

"Q. After Mr. Overstreet stopped and you saw the train coming, were you aware of the fact that you were too close to the track and in danger? A. Well, I knew we was going to be hit.

"Q. You knew you were too close to the track after you stopped? A. Yes, sir.

"Q. Did you say anything to Mr. Overstreet? A. No. I just said, 'This is it,' to myself."

On cross-examination she testified that she did not remember seeing the flashing lights at the crossing, but that she would not say that they weren't working. She again said that she didn't see them as she was looking over to her left watching the men working in the street. She did not see the lights that were flashing to the left. She was not looking at the lights but looking at the dirt and the men.

She had been over the crossing a number of times and knew there was a railroad crossing there. At one time she had seen a train on the crossing, and had seen the lights flashing at that time. She knew the lights were there, but she did not see them. She did not look for them for the reason above stated.

She further testified:

"Q. You didn't see the train until after your husband stopped the car, did you? A. Well, I don't know.

"Q. And I believe you answered in your deposition that at the time

**550**

you first saw the train you don't know how far it was from the crossing? A. I don't. Don't know a thing about it.

"Q. I believe you said on direct examination the car stopped and you looked up and saw the train and you said to yourself, 'This is it.' Is that right? A. Yes, sir. That is what I thought."

7.

The driver of the car, Mr. C. A. Overstreet, Sr., was present at the trial, but was not called as a witness and did not testify at the trial.

8.

The plaintiff sustained serious and, in the opinion of the court, some permanent injuries, but in view of the conclusion that has been reached by the court, it is not necessary to make specific findings as to the nature and extent of the injuries or the damages suffered by her.

Discussion

In the statement of the case the court has set forth in full the allegations of negligence made by plaintiff against the defendant. Likewise, the court has set forth in full the defense of defendant to the allegations of plaintiff. The case was meticulously tried by the able attorneys on the part of both plaintiff and defendant.

Many photographs were introduced, together with plats and drawings of the crossing, showing the location of various buildings in the vicinity of the crossing. In fact, plaintiff undertook to and did locate, by the use of the photographs, the position of many of the witnesses upon whose testimony she principally relied to establish negligence on the part of the defendant. Likewise, the defendant, by the use of photographs and plats, showed the location of certain buildings, the signal lights, the terrain, and, in general, the conditions that existed at the intersection on the day of the collision.

■ Defendant did not contend that the plaintiff and her husband were en-gaged in a joint enterprise at the time the collision occurred. Therefore, the negligence of plaintiff's husband is not imputable to her.

■ As set forth in Finding of Fact No. 7, the husband, Mr. C. A. Overstreet, Sr., was present at the trial and, although competent under Ark.Stat.Ann., Sec. 28–603 (1947), was not called as a witness by the plaintiff and did not testify. No explanation was offered or given for not calling him as a witness.

In 58 Am.Jur., Witnesses, Sec. 8, p. 26, it is said:

"In a civil case, failure of a party to produce an available witness who could testify upon a material issue and secure his testimony, if not explained, gives rise to an inference that the testimony of such witness, if presented, would be adverse to the party who failed to call him, and is a legitimate subject of comment by counsel in argument to the jury."

See also, 20 Am.Jur., Evidence, Sec. 187, p. 192.

The plaintiff has alleged that the collision was solely and proximately caused by the negligent acts and omissions of the defendant on the part of it agents, servants and employees operating the train in that:

(a) They failed to keep a constant lookout for persons and property upon the defendant's track at the crossing, whereas if such duty had been discharged by the persons operating said train the peril of the plaintiff would have been discovered in time to have avoided the collision.

(c) After discovering the plaintiff's peril, or after they could and would have discovered same had they discharged their duty to keep a constant lookout, the defendant's agents, operating said train, negligently failed to stop the same in time to avoid the collision, although they had ample time and space in which to do so.

(d) That after discovering the plaintiff's peril, or after they could

and would have discovered the same had they been keeping a constant lookout, the defendant's agents operating said train negligently failed to apply the brakes thereof and to slow its speed, and thereby minimize the force of the collision, and thus avoid the serious and permanent injuries resulting to the plaintiff, although they had ample time and space in which to do so.

(e) That defendant was grossly negligent in operating its train across the crossing without maintaining a flagman at said crossing to warn motorists lawfully using the public highway at that point.

The above contentions (a), (c), (d), and (e) are closely related and will be considered together.

Ark.Stat.Ann., Sec. 73–1002 (1947), requires all persons running trains in Arkansas:

" * * * to keep a constant lookout for persons and property upon the track of any and all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad, shall be liable and responsible to the person injured for all damages resulting from neglect to keep such lookout. Notwithstanding the contributory negligence of the person injured, where if such lookout had been kept, the employee or employees in charge of such train of such company, could have discovered the peril of the person injured in time to have prevented the injury, by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed." (Punctuation corrected as per Crawford & Moses Digest, Sec. 8568, and Pope's Digest, Sec. 11144.)

In Bond v. Missouri Pac. R. R. Co., Ark.1961, 342 S.W.2d 473, 475, the court said:

"Our cases on the Lookout Statute hold that, regardless of the negligence of the plaintiff in getting in a position of peril, nevertheless the Railroad Company is liable under the Lookout Statutes for any injury done to the plaintiff if the operators of the train, by complying with the Lookout Statute, could have seen the perilous position of the plaintiff in time to have avoided injuring him. Chicago, R. I. & P. Ry. v. Bryant, 110 Ark. 444, 162 S.W. 51; Missouri Pac. R. Co. v. Manion, 196 Ark. 981, 120 S.W.2d 715. Our cases further hold that evidence which justifies a finding that the plaintiff was injured by the defendant's train raises a presumption of negligence, and the burden is on the railroad company to show that the proper lookout was kept. St. Louis & San Francisco Ry. Co. v. Crick, 182 Ark. 312, 32 S.W.2d 815; and Missouri Pac. R. Co. v. Thompson, 195 Ark. 665, 113 S.W.2d 720."

In Missouri Pac. R. R. Co., Thompson, Trustee, v. Taylor, 1940, 200 Ark. 1, 137 S.W.2d 747, the court, beginning at the bottom of page 3, of 200 Ark., at page 748 of 137 S.W.2d, said:

"Our statute on lookout, Section 11144, Pope's Digest, [now Ark. Stat.Ann., Sec. 73–1002 (1947) ] imposes liability on railroads not only in cases of discovered peril; but in those instances also where, by the exercise of reasonable care, the peril might have been discovered, and this too regardless of the contributory negligence of the injured person. St. Louis-San Francisco Railway Co. v. Horn, 168 Ark. 191, 269 S.W. 576; Gregory v. Mo. Pac. Rd. Co., 168 Ark. 469, 270 S.W. 621."

In Missouri Pac. R. Co. et al. v. Ward, 1938, 195 Ark. 966, 115 S.W.2d 835, the court at page 971 of 195 Ark. at page 837 of 115 S.W.2d said:

"From the evidence before us it is obvious that Richard Ward was guilty of contributory negligence in approaching the crossing without exercising due care for his own safety. However, this conduct does not bar recovery if the jury believed, from substantial testimony, that if a proper lookout had been kept by train operatives the peril of appellee could have been discovered in time to have prevented the injury by the exercise of reasonable care after such discovery. The statute provides that the burden of proof shall devolve upon the railroad to establish the fact that the duty to keep the lookout had been performed. Pope's Digest, § 11144. The rule of judicial construction is that the duty of trainmen to take precautions begins when they discover that a traveler approaching the tracks will not act in a prudent manner. Blytheville, Leachville & Arkansas Southern Railway Company v. Gessell, 158 Ark. 569, 250 S.W. 881."

■■ Thus, under the law of Arkansas, the contributory negligence of a plaintiff does not bar recovery if the court finds, from substantial testimony, that if a proper lookout had been kept by train operatives, the peril of the plaintiff could have been discovered in time to have prevented the injury by the exercise of reasonable care after such discovery. Also, the burden of proof is upon the railroad company to establish that the duty to keep a constant lookout had been performed.

■ The learned attorneys have argued earnestly and eloquently that the evidence does not establish that a constant lookout was kept, but the court is convinced that the defendant's employees in charge of the train performed their duty to keep a "constant lookout for persons and property upon the track."

There is nothing in the engineer's testimony or in the credible testimony as a whole, or in the physical situation shown, that would justify the court in refusing to credit the testimony of the engineer, or in finding that those in charge of the train failed to keep a proper lookout.

■ The court cannot arbitrarily disregard the testimony of the engineer and fireman, or either, to the effect that they were keeping a lookout, and their testimony must be accepted unless contradicted by other credible evidence, direct or circumstantial. Missouri Pac. R. R. Co. v. Sanders, 1937, 193 Ark. 1099, 106 S.W.2d 182.

In Southern Lumber Co. v. Thompson, D.C.W.D.Ark.1955, 133 F.Supp. 92, at page 96, this court said:

"The evidence likewise conclusively establishes that the doctrine of discovered peril is inapplicable. Defendant's employees were keeping a lookout and, as soon as they discovered that plaintiff's truck might not be able to stop, they immediately did everything they could to stop the engine and avoid a collision. In other words, there was nothing to indicate that defendant's employees failed to keep a proper lookout or to act diligently to prevent striking the truck after its dangerous situation was discovered. Under these circumstances the doctrine of discovered peril does not apply. Haney v. Missouri Pacific Railroad Co., 214 Ark. 673, 217 S.W.2d 610."

In Haney v. Missouri Pac. R. Co., Thompson, Trustee, 1949, 214 Ark. 673, 217 S.W.2d 610, the court at page 676 of 214 Ark., at page 611 of 217 S.W.2d said:

"The engineer testified that he was keeping the look-out required by law, Ark.Stats.1947, § 73–1002, and saw the truck as it approached the crossing, but assumed that it was going to stop before it went on the crossing. He further testified that when he realized that the truck was proceeding to cross the track he applied his emergency brake in an unsuccessful effort to slow down the train and avoid the collision. There is nothing in the engineer's testimony, or in the testimony of other witnesses, or in the physical situ-

ation shown, that would have justified the jury in refusing to credit his statement, or in finding that those in charge of the locomotive failed to keep a proper look-out, or to act diligently to prevent injury to appellants after their dangerous situation was discovered."

The testimony is undisputed that signal lights and signal bells were operating, warning all persons that a train was approaching the crossing. There was nothing to prevent the plaintiff and the driver of the automobile from seeing those lights in ample time for the car to have been stopped. The plaintiff testified that she was not looking at the lights. Her attention, according to her testimony, had been attracted to some men working in South Fresno Street to her left and west of the crossing.

Ark.Stat.Ann., Sec. 75–637 (1959 Supp.), provides:

"(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:

"1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

"2. A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;

"3. A railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;

"4. An approaching railroad train is plainly visible and is in hazardous proximity to such crossing. * * *"

The plaintiff also contends that defendant was negligent in not having a flagman at the crossing.

In view of the statute heretofore set forth, Ark.Stat.Ann., Sec. 75–637 (1959 Supp.), it is difficult to understand this contention, or what more a "human flagman" could have done than was being done by the traffic control bells and by the flashing red signal lights with the admonition "Stop on Red Signal" in blazing color immediately under the lights.

In Missouri Pac. R. Co., Thompson, Trustee v. Doyle, 1942, 203 Ark. 1111, 160 S.W.2d 856, the court at page 1116 of 203 Ark., at page 858 of 160 S.W.2d said:

"As was said in the case of Bradley v. Missouri Pac. Rd. Co., 8 Cir., 288 F. 484, and cited with approval by this court in St. Louis-S. F. R. Co. v. Horn, 168 Ark. 191, 197, 269 S.W. 576: 'The only reasonable inference that can be drawn from their conduct is that they did not look, or, if they did and saw the train, deliberately took the chance of beating it over the crossing. If the former, they were guilty of gross negligence —if the latter, gross recklessness. If parties driving automobiles persist in gambling with death at railroad crossings, their estates should not be augmented by damages if death win. Care, not chance, is the requisite at railroad crossings.' "

At page 1117 of 203 Ark., at page 858 of 160 S.W.2d, supra, the court said:

"We agree with the trial court that there is no evidence in the record contradicting the testimony of appellant's witnesses that the required lookout was kept. In Blytheville, L. & A. So. Ry. Co. v. Gessell, 158 Ark. 569, 572, 250 S.W. 881, 882, this court said: 'The operatives of trains have the right to assume that a traveler or a pedestrian approaching a railroad track will act in response to the dictates of ordinary prudence and the instinct of self-preservation and will, in fact, stop before placing himself in peril, and the duty of the railroad employees to

take precautions begins only when it becomes apparent that the traveler at a crossing will not do so.'"

In Crossett Lumber Company v. Cater, 1940, 201 Ark. 432, 144 S.W.2d 1074, the court at page 436 of 201 Ark., at page 1076 of 144 S.W.2d said:

"Proximate cause of the injury was inattention upon the part of occupants of the car, and faulty brakes. The fireman was not negligent, after observing that the automobile was approaching at a low rate of speed, in assuming it would come to a stop before entering the crossing." Citing the Gessell case, supra.

In Missouri Pac. R. Co. v. Davis, 1939, 197 Ark. 830, 125 S.W.2d 785, the court at page 837 of 197 Ark., at page 788 of 125 S.W.2d said:

"The undisputed testimony shows that a lookout was being kept by both the engineer and the fireman, and the presence of the truck was discovered as soon as the train had passed the timber. The fireman saw the truck approaching the crossing, but all the testimony is to the effect that the speed of the truck was being reduced, and the fireman had the right, as the court told the jury, to assume that the driver 'would act in response to the dictates of ordinary prudence and the instinct of self-preservation and would, in fact, stop before placing themselves in peril,' and to rely upon that assumption until, in the exercise of reasonable care, he was aware, or should have been aware, that the truck would not stop. The very instant this discovery was made, and we think there was no testimony to support a finding that it could have been sooner made, the fireman jumped from his seat to warn the engineer, who had sole control of the movement of the train and was the only person who could do anything at all, and the engineer immediately did all that was possible. He first blew the warning whistle, and then applied the emergency brake, with such force that he came near wrecking the train and imperiling the lives and safety of the passengers on it."

The court has found that prior to reaching a point 800 feet from the crossing the engineer had observed automobiles and other vehicles on Towson Avenue south of the crossing traveling north. He first noticed the automobile in which the plaintiff was riding when it was approximately 300 to 350 feet south of the crossing. At that time the automobile, along with the other traffic, was proceeding north, and the engineer assumed that the automobile would stop at the crossing.

The engineer had a clear view of the crossing after he reached a point 800 feet northwest of the crossing, and he maintained a constant lookout for automobiles on the crossing. Other cars were crossing ahead of the locomotive, but when the locomotive had reached a point approximately 70 feet from the point of impact, the driver of the automobile in which the plaintiff was riding, as well as the plaintiff herself, disregarded the stop signals and signs, and negligently and suddenly stopped on the track immediately in front of the train. The engineer immediately applied the brakes, but by that time the locomotive was within 10 or 12 feet of the stalled automobile, and he was unable to stop the train in time to prevent striking the automobile. The uncontradicted evidence is that he succeeded in stopping the train within a distance of 250 or 300 feet after the application of the brakes, which was the shortest distance in which the train could have stopped after the automobile stopped on the track. In other words, the automobile was driven upon the track when the train was so close to the crossing that it was humanly impossible to stop the locomotive before striking the automobile.

The Court of Appeals for the Eighth Circuit, in Kansas City So. Ry. Co. v. Ray, 1940, 109 F.2d 708, at page 710, reviewed and considered the problems arising in the instant case, and said:

"The train was giving warning of its approach at its ordinary speed by continuous ringing of the bell and there is nothing to contradict the proof that the deceased was fully aware of the approach of the train when he was at least 50 or 60 feet away from the crossing. He failed to have the truck under such control that he could stop it or turn it off the road before it reached the railroad track. That such track is a place of danger which must be approached with care and caution and with the means of locomotion under control need not be reiterated. The want of care on the part of the decedent, which in law is called negligence, is obvious. While on the part of the railroad company there is no substantial evidence of any deviation from the ordinary and usual operation of a train. The ringing of the bell was compliance with the statute as the court instructed. The speed was moderate. The fireman was on watch and saw the truck apparently slowing down to a stop at a safe distance. He assumed, and under the Arkansas decisions had a right to assume, that the traveler would exercise due care for his safety. Missouri Pacific R. Co. v. Lemons, 198 Ark. 1, 127 S.W.2d 120, loc. cit. 122. He gave the alarm and the brakes were applied to the train immediately upon his becoming aware of the deceased's danger. The verdict and judgment being without substantial evidence in support thereof must be reversed. As the evidence affirmatively established that the negligence which caused the injury was that of the deceased, judgment of dismissal should be entered. It is so ordered."

▮ The plaintiff also alleged that the collision was solely and proximately caused by the negligent acts and omissions of the operators of the train (b) by operating the train over its branch line at a public crossing "at a time when the bell was not being rung or the whistle blown, as required by the statutes of Arkansas," and (f) that the train "approached and entered a crossing of a busy public thoroughfare at an unlawful, high and dangerous rate of speed." As to these allegations, the comparative negligence statute, Ark.Stat.Ann. Sec. 73-1004 (1947), applies, but it not necessary to compare the negligence of the plaintiff with the alleged negligence of the defendant for the reason that the testimony overwhelmingly established that the whistle was sounding and the bell was continuously ringing. The speed was 22 miles per hour, and no one has testified that that was an unusually high rate of speed, or an excessive speed, when it is remembered that there were no obstructions at the crossing to obscure the vision of drivers of vehicles using the crossing, and the crossing was further protected by the stop sign, the flashing red lights, and signal bells which ring a considerable period of time before any train enters upon the crossing. In other words, the evidence does not establish that the employees of the defendant were negligent in any manner. Therefore, since the defendant was not negligent, the plaintiff cannot recover.

Ordinarily the court would go no further in the discussion of the issues and contentions of the parties, but in view of the thoroughness with which the case was tried, briefed, and argued, the court feels that a discussion of the acts and omissions of the driver of the automobile, Mr. C. A. Overstreet, Sr., the husband of plaintiff, is justified, if not required.

It is not necessary to again set forth the facts as found by the court, but in considering whether the acts and omissions of Mr. Overstreet were the sole proximate cause of the collision and consequent injuries and damages, it should be borne in mind that both the plaintiff and Mr. Overstreet were familiar with the crossing; the automatic signal lights were flashing, and had been flashing for a considerable time, since they were activated by the train when it was approximately 1,400 feet from the crossing; there were two sets of lights facing south on the west side of the street—there were

also two sets of lights facing south on the east side of the street, and on the signal on the east side of the street there was an electric bell which was operating; the locomotive had been sounding its whistle long before it reached the crossing and continued to sound its whistle from far down the track until it reached the crossing; that the automatic bell on the locomotive was operating and that its headlight was burning; and that all other operators of motor vehicles who appeared and testified, going both south and north, testified that the approach of the train was very evident and that the signal lights were in operation.

■ Notwithstanding these facts, Mr. Overstreet approached from the south and proceeded to the track, apparently oblivious to the approach of the train. Since he did not testify, the court cannot say what he was doing or in which direction he was looking, but it is safe to assume that if his testimony would have been favorable to the plaintiff, he would have been called as a witness. Obviously, he approached the crossing never looking or giving thought to the presence of a train, which was signaling its approach by every possible means. It was running at a speed not in excess of 22 miles per hour, which certainly was not an excessive speed. The law does not require that trains at highway crossings must yield the right of way to automobiles crossing the tracks. There is an equal duty on the part of the operators of the train to give warning of their approach and to keep a lookout for automobiles, and on the part of the operator of an automobile to keep a lookout for trains upon approaching railroad tracks, which historically have been described by the courts as in themselves warnings of danger.

The record does not show just what occupied Mr. Overstreet's attention, but it is clear that he gave no thought or heed to the approaching train, and it is fair to infer that he did not see the train until, as stated by Engineer Martin, it was only a few feet away from him. He then suddenly stopped, perhaps hoping to stop short of the track, but he failed to do so.

■ The facts as found by the court are fully established by the evidence, and the court is convinced that under the facts and law the acts and omissions of Mr. Overstreet were the sole proximate cause of the collision. Haney v. Missouri Pac. R. R. Co., supra; Missouri Pac. R. R. Co. v. Davis, supra; Missouri Pac. R. R. Co., Thompson, Trustee v. Doyle, supra; Kansas City So. Ry. Co. v. Ray, supra; Missouri Pac. R. R. Co., Thompson, Trustee v. Yandell, 1946, 209 Ark. 569, 191 S.W.2d 592; Missouri Pac. R. R. Co., Thompson, Trustee v. Howard, 1942, 204 Ark. 253, 161 S.W.2d 759; Missouri Pac. R. R. Co., Thompson, Trustee v. Carruthers, Adm'r, 1942, 204 Ark. 419, 162 S.W.2d 912; Missouri Pac. R. R. Co., Thompson, Trustee v. Binkley, 1945, 208 Ark. 933, 188 S.W.2d 291; Chipman v. Missouri Pac. R. R. Co. et al., 1938, 195 Ark. 721, 114 S.W.2d 14; Harper v. Missouri Pac. R. R. Co, 1958, 229 Ark. 348, 314 S.W.2d 696; Missouri Pac. R. R. Co. v. Sanders, 1937, 193 Ark. 1099, 106 S.W.2d 182; Missouri Pac. R. R. Co. v. Baldwin, 8 Cir., 1941, 117 F.2d 510.

In Louisiana & A. Ry. Co. v. Smith, 8 Cir., 1943, 133 F.2d 436, the Court of Appeals reviewed many of the decisions the Arkansas Supreme Court had rendered up to the time the case was considered. No subsequent decisions of the Arkansas Court militates against the result reached by the Court of Appeals.

The defendant was not guilty of any negligent act or omission that was a proximate cause of the collision and consequent injuries and damages to plaintiff. On the other hand, the sole proximate cause of the collision was the negligent acts and omissions of C. A. Overstreet, Sr.

### Conclusions of Law

#### 1.

The court has jurisdiction of the parties to and the subject matter of the action. Title 28 U.S.C.A. § 1332 (1960 Supp.).

**2.**

The employees of defendant were not guilty of negligence in the operation of the train.

**3.**

The sole proximate cause of the collision and resulting injuries to plaintiff was the negligence of the driver of the automobile, Mr. C. A. Overstreet, Sr.

**4.**

Judgment dismissing the complaint at the cost of plaintiff should be entered.