W. F. ALLEN, ADM'R v. LAKE CATHERINE FOOTWEAR CORP.

5-4827                                                   437 S.W. 2d 803

Opinion Delivered March 3, 1969

*Jim C. Cole* for appellant.

*Wright, Lindsey & Jennings* for appellee.

CARLETON HARRIS, Chief Justice.   Appellant, as administrator of the estate of Elwood Allen, deceased, brought a wrongful death action against appellee, Lake Catherine Footwear Corporation, in the Circuit Court of Hot Spring County.   Appellee operates a shoe manufacturing plant in Garland County, and J. R. Stanage held a contract with appellee to haul off waste and trash from its plant.   Stanage, stipulated to be an independent contractor, hauled this waste and trash six days per week.   It is also stipulated that Lake Catherine Footwear had no control over the means or methods of his operation in disposing of the waste material. The waste consisted of scrap leather, cloth, rubber, outsole and insole material, and other similar remnants.   Included was a flammable, combustible, and volatile naphtha base liquid cleaning material.[1]   The pattern for disposition of the trash was for Stanage to park his truck at the plant, and the company's employees would load it with all of the scrap material except the naphtha base liquid. This was placed in barrels or drums on the dock, and picked up last by Stanage.   These drums were ordinarily marked with a red or yellow label with the word "caution" in large letters and "inflammable material, volatile solvent" painted thereon.   No witness was able to say whether the drums loaded on February 18, 1966, were so marked.

Stanage had known Elwood Allen for approximately twelve years, and Allen had worked for him, off and on, during that period; also, Allen had worked inter-

---

[1]According to Donald Munro, plant manager for the appellee, the liquid is used to wash the "upper of the shoe," if the leather is particularly dirty.   Operators use the solvent until it becomes so dirty that it is unusable.   It is then discarded.

mittently for Stanage during the six or seven years that he had been disposing of the trash. The witness said that Allen, who could not read nor write, and perhaps was to some extent mentally retarded, could only be used for ordinary labor, though he was able to operate a Ford tractor. He (Stanage) said that he had been advised by company employees that the solvent should not be thrown in when the trash was burned—that it might be explosive.

On February 18, after picking up the trash and solvent, the trash was dumped in a ravine selected by Stanage, and the solvent was poured over it. Subsequent events are then described by Stanage:

"Well, when I got that on there, I got on this machine I had there and shoved it over in the pit with it, and started driving it away. I asked if anyone had matches. No one had any. I said there are usually some in the truck. I said, 'get the matches.' Doug got the matches and started back with them. So, Elwood said, 'Let me have them.' He gave them to him. As I was watching there he started down in this ravine. There is a kind of little pathway like deal going down in there. I said, 'Judge, don't go down in there and light that stuff off, you are liable to get blown up.' So, I am moving out on the machine at the time I said that. So I went over and parked it and come back over there. He was still down in there attempting to strike the matches, little book type matches. One of my boys, I believe Dave said, 'He is not going to get that lit down there.' I said, 'Come out of there, Judge and let's light the thing from up here.' I don't really remember whether he said anything or not. Usually he didn't whenever I would talk to him like that, so I stood there another instant. I said, 'Come on up here, Judge and give Doug those matches and let him light a piece of paper and throw over there and we will do it from

up here,' and I said, 'Everything will be all right' or something to that effect. That is all I said. About the time I completed that statement he was still in the operation of striking the match and so I guess this thing must have sparked. I don't think he threw the match in the fire. When he made the arc, the air was full enough of these vapors coming off this stuff, it exploded.''

Allen was severely burned, and subsequently died. Suit was then instituted, appellant asserting that the company, its agents and employees, were negligent and careless in placing the solvent in unmarked or inadequately marked drums; in failing to adequately warn the deceased and others of the high and unusual danger involved; and in placing the dangerous liquid waste in the possession and control of persons without educating those persons as to the danger involved in the use and disposition thereof. On trial, at the conclusion of appellant's evidence, the company moved for a directed verdict; after argument of counsel, the motion was granted, and the jury was instructed to return a verdict for appellee. From the judgment dismissing appellant's complaint, comes this appeal.

Appellant has submitted an able brief, relating to liability of persons supplying chattels which are known to be dangerous for the use of others. It is also argued that the manner in which the solvent was disposed of involved an unreasonable risk of bodily harm to the decedent, and that the company knew, or should have known, that Elwood Allen was mentally retarded, and that he would probably use the solvent in a manner involving unreasonable risk of bodily harm to himself or others. Though Allen's mental condition is mentioned by appellant several times, the evidence of any mental deficiency is meager indeed. In fact, the only evidence relating thereto was given by the witness, Stanage. He was asked, ''Was Mr. Allen to some extent mentally retarded, or mentally slow?'' The answer was, ''Well

my impression of it was yes. I am not an authority. My impression was yes.'' Since apparently Allen had practically no education, and could not read nor write, he could well have appeared retarded without that actually being the case. The brother of the deceased, W. F. Allen, also testified, but he only said that his brother was unmarried, and unable to read or write; there was not the slightest reference to a lack of mental competency. It might also be pointed out that there is no showing that any company employee had any reason to believe that Allen was mentally retarded; for that matter, it is not shown that any of the company employees ever saw Allen. The testimony is even conflicting that Allen was ever present at the plant site when the solvent was picked up. The only witness to testify about this matter was Stanage who first stated that Allen had accompanied him on some occasion or occasions when the trash was picked up at the plant site; subsequently, however, Stanage stated that he couldn't really remember whether Allen had been with the crew when this was done. Apparently, most of the time, Allen would go to the dump where the trash was disposed of.[2] The Contractor was definite in stating that Allen was not with him when he picked up the drums on February 18.

However, under the facts of this case, we see no necessity to enter into a discussion of appellee's possible duty to Allen, or whether warnings to the independent contractor satisfied any legal obligation, for the failure

[2]Stanage testified that Allen was not a regular employee: "He just worked for me whenever I had some labor type work which he was qualified to do, and he did work of that nature and he would also work for other people in the neighborhood doing gardening work and yard work for women around there or anyone that could use him or brush cutting and what not. Never worked for me steady, never had him on any payroll." He said that Allen lived close to the dump where he burned the trash, and that "if he happened to be around he would come down. He lived right in the area." According to the witness, Allen's primary reason for going to the dump would be "to get things of value he could sell to the shoe shop in town maybe or buckets, five gallon buckets on there, he could sell and soda pop bottles."

of appellee to give any warning to Allen was not the proximate cause of the accident and injuries sustained.

In *United States* v. *Bowers,* 202 F. 2d 139, the United States Court of Appeals for the Fifth Circuit, in reversing a judgment under the Federal Tort Claims Act, said:

"Assuming without deciding that the negligence found by the court is within the terms of the Federal Tort Claims Act, we are of the opinion that under the evidence the finding of negligence proximately causing the plaintiff's injuries was clearly erroneous. The plaintiff admitted that he had used the road dozens of times, was thoroughly familiar with it, that he knew there were no guard rails on it, and that he knew where the edge of the road was. Failure to warn the plaintiff could not have been negligence proximately causing his injuries when he was already so familiar with the road as to appreciate the peril."

In *Arkansas Portland Cement Company* v. *Taylor,* 179 Ark. 915, 18 S.W. 2d 904, we said that there is no duty to warn, when the danger should be obvious. See also *A. A. Electrical Company* v. *Ray,* 202 Ark. 85, 149 S.W. 2d 38; *Parker* v. *Heasler Plumbing and Heating Company* (Wyo.), 388 P. 2d 516. We have held in numerous railroad cases that the failure to sound a whistle or bell, when approaching a crossing for the purpose of warning a motorist of the approach of the train, ceased to be a factor, and no recovery could be had for failure to give these signals, when the presence of the train was plainly discoverable by other means. *Missouri-Pacific Railroad Company, Thompson, Trustee* v. *Doyle,* 203 Ark. 1111, 160 S.W. 2d 856; *Missouri-Pacific Railroad Company, Thompson, Trustee* v. *Carruthers,* 204 Ark. 419, 162 S.W. 2d 912; *Chicago, Rock Island and Pacific Railway Company* v. *Sullivan,* 193 Ark. 491, 101 S.W. 2d 175; *Kansas City Southern Railway Company* v. *Baker,* 233 Ark. 610, 346 S.W. 2d 215.

What, then, is the evidence with regard to Allen's knowledge that the solvent was dangerous, and should be handled with extreme care? The testimony reflects that Allen had received one of the clearest warnings possible—far more impressive than merely being told that the liquid was dangerous; he had observed an explosion resulting from the liquid's being thrown on a smoldering fire. Stanage testified to this occurrence as follows:

"* * * Whenever we were down at this original dump I had been using, he had been there. The reason I remember particularly was that the smallest boy, Dave [Stanage's son], was using some of that stuff in an open container and throwing it on the fire. I wasn't aware he did it. He threw it on a fire that was smoldering in order to get it to burn more. The fact is the material had been rained on laying there the earlier part of the week. It had been rained on and it tended to smolder on. On Saturday we kept the stuff burned. That was the day we cleaned and burned it up. He threw this stuff on there and it exploded out there and almost burned him. If he hadn't been as fast as an actor as he was, it probably would have. Me and Elwood was standing over by a little shop I have there and I said, 'Look there. That is what that stuff will do to you.'"

The testimony of Stanage relative to the warnings he shouted to Allen just prior to the explosion has been heretofore set out, and there is no necessity to reiterate that evidence.

It is clear that Allen had observed the dangerous propensity of the liquid at least once prior to February 18. It is also undisputed that on that date Allen was warned three times not to light the trash pile down in the ravine, Stanage specifically saying, "You are liable to get blown up."

It being apparent from what has been said that any failure on the part of appellee or its employees to personally warn Allen of the dangers of the solvent was not a proximate cause of appellant's injuries and death, the trial court did not err in directing the jury to return a verdict for appellee.

Affirmed.