HARPER *v*. MO. PAC. RD. CO.

5-1595                                    314 S. W. 2d 696

Opinion delivered July 1, 1958

*McMath, Leatherman & Woods* and *Mathis & Keys,* for appellant.

*Pat Mehaffy* and *B. S. Clark,* for appellee.

ED. F. MCFADDIN, Associate Justice. At the completion of all the evidence the Trial Court instructed the jury to return a verdict for the defendant; and the correctness of that ruling is the only issue on this appeal. Our rule for testing such a ruling is well established: giving the evidence of the plaintiff its strongest probative force, was a question made for the jury regarding the alleged negligence of the defendant? (*Hawkins* v. *Mo. Pac. Rd. Co.,* 217 Ark. 42, 228 S. W. 2d 642.) With this rule in mind we state the facts in the light most favorable to the plaintiff.

Mrs. Irene Harper, as administratrix, brought this action against the defendants, Missouri Pacific Railroad Company and G. C. Brown, engineer, seeking to recover damages for the death of her husband and intestate, Mr. Olan Harper. It was established that Mr. Harper, aged 41, left his home near Benton about 3:00 P. M.

Saturday afternoon, September 15, 1956, planning to go to a neighbor's home to place a call about a fishing trip; that Mr. Harper never returned home alive; that at 3:35 A. M. Sunday morning, September 16, 1956 Missouri Pacific northbound train No. 26, proceeding from Benton to Little Rock, struck Mr. Harper and killed him as he was trying to cross the railroad track on the road from Benton to Bauxite. No one witnessed the striking except the engineer and fireman of the Train No. 26. The fireman, Mr. Garland Fisher, testified as to the striking (as abstracted by appellant — plaintiff below):

"As train 26 approached the Benton-Bauxite Crossing I was keeping a lookout ahead. As we approached the crossing, we came around there somewhere around 3 or 4 cars, or maybe it is a little farther, that you can see this before crossing with your straight beam headlight and your oscillating headlight, then when you get two or three cars, straight beam headlights, you can see the whole crossing, and the whole crossing at that time was clear, nothing on it, no cars, no nothing. You could see the whole crossing and this man came out of the shadows or dark and was running on his feet right down the middle of the highway a short distance from the south main track; then we got within a car and a half of the crossing and I picked him up with the oscillating headlight and got the view of the man running; then when we got within a car and a half of the crossing, I shouted to the engineer. 'The man is not going to stop' and he went to tooting the whistle and raised his hand up to apply the brakes and by that time we had done hit the man. At the time I first saw the man he was running. When I first picked up the man we were somewhere around a car and a half or two cars or three from the crossing. A car is 80 feet. (I picked him up first with the oscillating headlight, but we got up two cars there and the straight beam headlight puts it all on the whole crossing, and it also put it on there before we hit the man but was almost on the crossing.) When I first picked him up with the oscillating headlight he was not over 30 feet from the crossing — that is just

an estimate. He was running just as hard as he could run. In my mind I felt that the man knew we were coming and that he would stop, he had plenty of time to stop, either turned up north or south of the track and avoid running out in front of us. When it became apparent he wasn't going to stop I hollowed at the engineer that the man was not going to stop, and he was blowing the road crossing whistle and he went to tooting it just like when anything is on the track, and when he toots just as fast as he could, put his hand on the — and no more than the snap of your fingers, he had already hit the man. He reached for his brake at the same time. From the time I first saw him until it became apparent he wasn't going to stop it was just the snap of your finger. He almost made it across the crossing. I would say he lacked maybe a step or something like that making it across. He was hit on the engineer's side. The train is about 3 or 4 cars from the crossing when you can see the whole crossing. That is just an estimate. I looked at the crossing when it first came in view. No one was on or near the crossing at that time. When he came in view of my oscillating lights I saw him. I did not observe any cars passing over the crossing. The weather was clear. The accident occurred at 3:35. I saw the blinker lights at the crossing working as we approached the crossing. I heard the bell ringing on the crossing lights as we went by the crossing. The engineer was sounding his whistle;  . . ."

The engineer, Mr. Brown (joined as a defendant in the case), testified as to the striking (as abstracted by appellant):

"No. 26 was a passenger train. It had ten cars. It was the train involved in an accident at the Benton-Bauxite crossing in which Mr. Alan Harper was killed. The train was traveling between 65 and 70 miles an hour at the time it reached Bauxite crossing. As we approached the crossing I was keeping a lookout ahead. I was blowing my whistle and about three car lengths before I got to the crossing or maybe three and a half,

my fireman said, 'We are going to hit a man' and I was blowing my whistle for the crossing but when he told me I went to blowing short blasts, just a warning, just when I got it on I seen the man run, running across the track ahead of me, possibly around 20 feet but by the time I got my brake on I had done hit him. When the fireman told me I was about to hit a man I started blowing short blasts of my whistle and put my brake on but by the time I got my hand to the brake the train struck the deceased. As I approached the Bauxite Crossing I did not observe anything on the crossing. From Texarkana to Little Rock my scheduled running time is two hours and 45 minutes. I might have been 10 or 12 minutes late when I reached the Bauxite crossing, . . .''

The evidence also showed without contradiction: that after the railroad track leaves Benton going toward Little Rock it is a straight track for about 2,600 feet, then the track takes a one decree curve to the left and the curve extends about 3,300 feet; that near the center of this curve (about 1,650 feet from where the curve began) the road from Benton to Bauxite crosses the railroad track; that it is approximately 4,300 feet from the said railroad crossing back to the Benton railroad depot; that at the said railroad crossing there were two red blinker lights on each side of the crossing and also a warning bell; and that the warning bell and all the lights were working at the time Mr. Harper attempted to run across the railroad track in front of the train No. 26. Furthermore, there was a street light in the locality.

The appellant does not claim that there was any failure by the defendants to comply with the warning board statute (§ 73-717 Ark. Stats.), or the lookout statute (§ 73-1002 Ark. Stats.), or the whistle and bell statute (§73-716 Ark. Stats.), or the headlight statute (73-704 Ark. Stats.), or any other applicable statute: rather, appellant says that this is a common law negligence action and that the applicable rule is contained in the following words found in the case of *Zaloudek* v.

*Mo. Pac.,* 193 Ark. 344, 99 S. W. 2d 567: ". . . the true test of liability was whether the death . . . was the result of the failure of the appellee, in the exercise of ordinary care, to operate its train so as to avoid striking and killing . . . (deceased), under all the circumstances and conditions existing at the time about or near the . · . . crossing". On the basis of the foregoing statement, appellant urges that a jury question was made on either of two points, which we now discuss:

I. *Appellant says*: "*Whether excessive speed under the circumstances constituted negligence was for the jury.*" Appellant relies most strongly on the case of *Davis* v. *Scott,* 151 Ark. 34, 235 S. W. 407, wherein this sentence appears: "Unusual speed of a train does not, under all circumstances, constitute negligence, and often the Court may declare, as a matter of law, that the maintenance of a high rate of speed under given circumstances does not constitute negligence, but under other circumstances it may become a question of fact for the determination of the jury". The appellant says that the facts in the case at bar make a question for the determination of the jury. But we cannot see how the speed of the train made a fact question for the jury in the case at bar. The Train No. 26 was a northbound passenger train; it was ten to twelve minutes late at the last time station a few miles before striking Mr. Harper. The train was only maintaining its scheduled speed. It was travelling from 65 to 70 miles per hour.

It was shown without contradiction that when the train operators discovered that Mr. Harper was going to try to run across the track in front of the train the engineer immediately gave the whistle for danger and undertook to apply the brakes, but it was shown that the train would travel a considerable distance before there would be any retardation of the speed. Under all the facts here, speed of the train was not what caused Mr. Harper's death: rather it was his effort to run across in front of the train. If the train had been going much slower, still it would have travelled a considera-

ble distance before retardation of the speed would have taken effect,[1] so the claim of excessive speed did not make a jury question in this case.

II. *The appellant says*: *"Whether failure to station a flagman at this crossing, in view of the special dangers arising at this particular time, constituted negligence was for the jury"*. It is shown that the crossing here involved was within the city limits of the City of Benton, which has a population in excess of 10,000, and that the road that crossed the railroad track was one of the main traveled roads from Benton to Bauxite. Appellant relies most strongly on certain language contained in *Fleming* v. *Mo. & Ark. RR. Co.,* 198 Ark. 290, 128 S. W. 2d 986:

"It is the settled rule that whether failure of a railroad company to station a flagman at a crossing constitutes an omission of such care as an ordinarily prudent person would use under the same or similar circumstances, is a question of fact where there are obstructions which materially hinder the view of approaching trains, provided the crossing is used frequently by the public, and numerous trains are run. Inasmuch as permanent surroundings may create a hazardous condition, the rule of care goes further and requires precautions where special dangers arise at a particular time. It is said that the obligation exists, at an abnormally dangerous crossing, to provide watchmen, gongs, lights, or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the circumstances make their use by the railroad reasonably necessary to give warning of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track."

[1] We have several cases in which directed verdicts for the defendant have been given, even against the plaintiff's claim of excessive speed. Some of these are: *Tinsley* v. *Mo. Pac.,* 189 Ark. 530, 73 S. W. 2d 473; *Garner* v. *Mo. Pac.,* 210 Ark. 214, 195 S. W. 2d 39; and *Walker* v. *Mo. Pac.,* 211 Ark. 635, 201 S. W. 2d 768.

The evidence in the case at bar fails to show that there was any other person anywhere near the Bauxite crossing at 3:30 A. M. on the Sunday morning when Mr. Harper was struck by the train: the evidence also fails to show that there were any obstructions which could have in any way prevented Mr. Harper from seeing the blinker lights at the crossing; and the evidence fails to show that there was any noise that would have prevented Mr. Harper from hearing the warning bells sounding at the crossing. In the absence of such proof, we see no factual issue to submit to the jury on this point. Of course, there are cases presenting factual situations that would make a jury question as to negligence in failing to have a flagman or guard at crossings; but no such factual situation was shown in the case at bar.

## CONCLUSION

We find no facts shown which were sufficient to take the case to the jury under Act No. 191 of 1955 (the governing Act in this case), or any other Act in regard to excessive speed or failure to have a flagman on duty at the time and place here involved.

Affirmed.