FIRST COMMERCIAL BANK, N.A. *v.* Bettye A. KREMER

86-263                                                728 S.W.2d 172

Supreme Court of Arkansas
Opinion delivered April 27, 1987

*Friday, Eldredge & Clark*, by: *C. Tab Turner*, for appellant.

*Robert A. Newcomb*, for appellee.

DAVID NEWBERN, Justice. This appeal is from a judgment, based on a jury verdict, holding the appellant liable in a malicious prosecution case. The appellant contends first that the evidence is insufficient to support the verdict. Second, the appellant claims the court erroneously refused to instruct the jury that if in this action the jury found the appellee to have been guilty of the criminal offense with which she was previously charged because of the appellant's allegations, it should find for the appellant. The third point is that the punitive damages awarded are so large as to shock the conscience of the court and should be reduced or a new

trial granted. We affirm, as we find the jury's verdict was supported by substantial evidence, the instruction proffered was not a sufficient statement of the law, and the jury's verdict was not so large as to shock the conscience of the court.

In a case in which a defendant's directed verdict and judgment notwithstanding the verdict motions were denied and it is contended that the evidence was insufficient to support the plaintiff's claim, we view the evidence in the light most favorable to the plaintiff. If we find any evidence sufficient to warrant the verdict, we affirm the trial court's refusal to direct a verdict. *Higgins* v. *Hines*, 289 Ark. 281, 711 S.W.2d 281 (1986); *Downey* v. *Jones Mechanical Contractors*, 273 Ark. 207, 619 S.W.2d 614 (1981).

The appellee is a recovering alcoholic who, after six months of sobriety, engaged in a serious drinking bout. In a very intoxicated condition she called a friend, Ms. Bruno, for help. Ms. Bruno called Arkansas Rehabilitation Institute (ARI) and learned that the appellee could be admitted there but would have to bring $400 as a deposit, pending confirmation of insurance coverage, to pay for her stay at ARI. Ms. Bruno made out a check for $400 on the appellee's account and had the appellee sign it. In the process of having the appellee admitted to ARI, the check apparently was displayed, but Ms. Bruno left the facility with the check after the appellee had been admitted. The check Ms. Bruno testified she filled out is not the one which became the subject of this litigation. The appellee checked out of ARI the following day. Sometime later, she discovered that a $400 debit, not shown in her personal check records, had been made on her checking account at the appellant bank. At her request, the appellant mailed her the check representing the debit. It was a check to ARI, but the appellee did not recall having made any such check to ARI, and she concluded some other person had signed her name. Her conclusion was based on the signature, which she did not recognize as her own, and particularly on the fact that the middle initial "K" was used rather than her middle initial which is "A." The check introduced into evidence showed the appellee's name printed on the check form as "Bettye K. Kremer" and signed "Bettye K. Kre*n*er." The printing apparently had been done erroneously, as it was undisputed that the signature card on file with the appellant showed the signature as "Bettye A.

Kremer."

After concluding there had been a forgery of her signature, the appellee called the appellant and spoke with an employee who explained that the appellee would have to make out an affidavit that the check had been forged in order to receive credit for the $400. The appellee signed the affidavit which stated that the signature on the check was not hers, that the check was made without her knowledge and consent, that she never received any benefit or value for the check, and that she had not presented it for negotiation or payment. The appellant's employee helping the appellee asked if she knew who would forge a check on her account to ARI, and the appellee replied that she had been at ARI over the weekend.

The appellant then placed the matter in the hands of its employee David Butler. Mr. Butler called ARI and spoke with Ms. Hoppis who told him she had seen the appellee sign the check. He then compared the signature on the check with that on the signature card and noted that the middle initials were different. Mr. Butler then took the matter up with Detective Matlock of the Little Rock Police Department. At Detective Matlock's request, the appellee provided handwriting samples for comparison purposes, and an analysis was done by the State Crime Laboratory which concluded that it could not identify the writing contained in the signature on the check. Detective Matlock attempted to speak to Ms. Hoppis but was told she could not speak with him because of the institute's policy of confidentiality. He then spoke with Deputy Prosecutor Cairns who advised him that no criminal charges should be filed, but the matter should be handled as a civil suit. Detective Matlock reported the results of the handwriting analysis to Mr. Butler. He told Mr. Butler that he and Mr. Cairns felt there was no criminal prosecution evidence, and further that he thought that Ms. Hoppis had written the signature on the check with no criminal intent but had done so just to help the appellee. Mr. Butler disputed Detective Matlock's testimony, saying Matlock did not inform him of Mr. Cairns's recommendation.

Mr. Butler then spoke to another deputy prosecutor, Mr. Douglass. In discussing the case with Mr. Douglass, Mr. Butler did not mention that the check had been to the laboratory. He did

not tell Mr. Douglass that another deputy prosecutor had reviewed the case, made a negative recommendation, and expressed suspicion of Ms. Hoppis. Neither could Mr. Douglass recall that Mr. Butler told him about the disparity in the middle initials. Mr. Douglass thereafter obtained a sworn statement from Ms. Hoppis that she had seen the appellee sign the check. Mr. Douglass's testimony was that he would not have issued the warrant for the appellee's arrest when he did so had he known the facts known to Mr. Butler. However, the warrant was issued, and the appellee was arrested at her apartment, on charges of false swearing and theft by deception, by two uniformed policemen, one of whom testified that she was crying and shaking uncontrollably. She was taken to the police station where she was fingerprinted and "booked." Although it was not his custom to do so, one of the officers called a municipal judge and obtained his permission to release the appellee on her own recognizance because the officer had decided that in view of her "upset" condition it would be best that she not be placed in the detention center. The policemen detected no evidence that the appellee had been drinking that evening.

Both of the charges against the appellee were dismissed by the municipal court for insufficient evidence of intent and lack of probable cause. Thereafter, employees of the appellant asked the prosecutor's office to file the theft by deception charge with the circuit court despite the municipal court's ruling. The request was refused.

## 1. Failure to direct a verdict

The first point for reversal is stated in the appellant's brief as follows:

> The trial court erred when it failed to grant defendant's [appellant's] motions for directed verdict and judgment notwithstanding the verdict on the issue of probable cause where eyewitness testimony formed the basis of defendant's [appellant's] initiating criminal proceedings and the jury's verdict is not supported by substantial evidence.

The argument under this point is primarily that the appellant was entitled to a directed verdict as a matter of law because in *Malvern Brick and Tile Co.* v. *Hill*, 232 Ark. 1000, 342 S.W.2d

305 (1961), we held that one who bases a criminal prosecution upon an eyewitness identification of the accused cannot lack probable cause. We had taken that argument and citation to contend that because the appellant had the statement of Ms. Hoppis that she saw the appellee sign her name to the check and the appellant also knew that the appellee had sworn she had not signed the check, it was the obligation of the trial court to direct a verdict because, as a matter of law, the appellant had probable cause to prosecute. However, in oral argument the appellant asserted that this point for reversal had another aspect. It contended that the evidence was insufficient to show a lack of probable cause because it was undisputed that the appellee had received a benefit from the funds represented by the check, whereas her sworn affidavit stated that she had not received any such benefit.

### a. Receipt of benefit

The appellee testified that when she went to the appellant to execute the forgery affidavit she did not have her glasses and could not read the document she was asked to sign. She said the appellant's employee who helped with the document explained only that it was a statement that someone other than the appellee had signed the check. The employee testified that she explained the document fully, including the part about not receiving a benefit. The one clear thing about what was said in that encounter is that the appellee did not try to hide the fact that she had had a recent relationship with ARI. The appellant's employee testified that the appellee told her she had been at ARI the previous weekend.

An employee of ARI testified that the appellee's bill at ARI of over $1,000 had not been paid, but the appellee testified that when she checked out of ARI she was told her bill would be covered by insurance. The appellee also testified that she did not know how much of her bill at ARI remained unpaid.

Even if it were undisputed that the bill had not been paid, that would not resolve the factual question whether there was probable cause for the appellant's employees to charge the appellee with false swearing or theft by deception. Both the offense of false swearing, see Ark. Stat. Ann. § 41-2603 (Repl. 1977), and theft by deception, see Ark. Stat. Ann. § 41-2203

(Repl. 1977 and Supp. 1985), require knowledge on the part of the perpetrator. There clearly was a question for the jury whether the appellant had a reasonable belief that the appellee knowingly executed the affidavit falsely with respect to whether she received a benefit from ARI in exchange for the funds represented by the check.

### b. Probable cause as a matter of law

As noted above, the appellant contends that because the prosecution of the appellee was based on Ms. Hoppis's eyewitness testimony it had probable cause as a matter of law, citing *Malvern Brick and Tile Co.* v. *Hill, supra.* In that case, one Mendenhall alleged he had been beaten by seven persons. The altercation had to do with a labor dispute at Malvern Brick and Tile Co. where Mendenhall was employed. He reported to Mr. Garvan, the executive vice-president of the company, and told him that shots had been fired into his home. Garvan inspected Mendenhall's home to see the bullet damage, and then he took Mendenhall to the prosecutor's office where Mendenhall named the seven people who had battered him, including Hill. All seven were prosecuted on the basis of an affidavit for warrant for arrest executed by Mendenhall. The company posted $100 as "advance court costs" to assure the prosecution of the seven persons named. At the trial, Hill testified he had been elsewhere at the time of the battery, and he was ultimately acquitted of the battery of which the other six named were convicted. Hill sued Mendenhall, the company, and Garvan for malicious prosecution. A jury verdict found all three liable. Reviewing the evidence to determine whether the jury could properly have determined that Garvan and the company lacked probable cause to sponsor the prosecution of Hill, we found no evidence that probable cause was lacking. Rather, we found that Garvan and the company had done what any good employer would have done in the same circumstances, and that it was proper to have relied on the identification of Hill by Mendenhall. Our opinion contained the following:

> In malicious prosecution cases we have defined the words, "probable cause," as "such a state of facts known to the prosecutor, or such information received by him from sources entitled to credit, as would induce a man of

ordinary caution and prudence to believe, and did induce the prosecutor to believe, that the accused was guilty of the crime alleged, and thereby caused the prosecution." *Hitson* v. *Sims*, 69 Ark. 439, 64 S.W. 219 [1901]; *Whipple* v. *Gorsuch*, 82 Ark. 252, 101 S.W. 735 [1907].

. . .

In the annotation in 43 A.L.R. 2d p. 1048, cases from several jurisdictions are cited to sustain the statement: "Where the defendant in good faith has relied on an apparently sound identification by some other person, the Courts have held that there is no liability in malicious prosecution." [232 Ark. at 1004-1005, 342 S.W.2d at 308.]

That is, of course, the language upon which the appellant in the case before us has relied. However, there is much more to the opinion:

Furthermore, the evidence established without contradiction that when Mendenhall went to the office of Malvern [the company] . . . and told Garvan of the assault, then before doing anything, Garvan consulted immediately with the regular retained attorneys of Malvern. Garvan and Malvern relied on the advice of competent and qualified counsel. We have a long list of cases in Arkansas — and the general rule over the country is to the same effect — that when one recites the full facts to a competent attorney, such is a complete defense against the charge of acting without probable cause. . . . In view of these cases, it is clear that Garvan and Malvern, by acting on the advice of competent counsel, entirely dispelled any claim that they acted without probable cause; and until Hill could establish that Garvan and Malvern acted without probable cause, he could not hold them liable in this malicious prosecution action. Therefore, as to Garvan and Malvern, the judgment is reversed and dismissed.

While we noted the propriety of the reliance on Mendenhall's statement, it is apparent that our holding in the case was that Garvan and the company had not been shown to lack probable cause in view of their having recited the full facts to a

competent attorney and having been advised by him to proceed. Obviously, the appellant in the case before us now cannot rely on that holding.

This case, and *Malvern Brick and Tile Co.* v. *Hill, supra*, differ importantly in another aspect. There the defendant possessed no information which would contradict the content of the third party's statement. Here the defendant had other information available which was at odds with the eyewitness's statement.

■ The existence of probable cause is determined by an examination of the information known to the defendant at the time the proceedings were instituted. *See Carroll* v. *Gillespie*, 14 Mass. App. 12, 436 N.E.2d 431 (1982), a case very similar to this one, which provides an excellent overview of this subject. Where the only information known to the defendant is contained in a third party's statement, and he is possessed of no information inconsistent with that statement, probable cause may exist as a matter of law.

■ In this case, the appellant relied on an eyewitness statement, but was also in possession of the following contradictory facts: the differing middle initial, the inability of the crime laboratory's handwriting expert to identify the signature as that of the appellee, Detective Matlocks's suspicion of Ms. Hoppis as the author of the signature, and Mr. Cairns's assessment of the matter as lacking in evidence to prosecute.

The jury should be allowed to consider all the evidence available to the defendant to determine if ordinary caution was exercised in bringing the charges. To hold otherwise would allow the defendant to avoid the jury's scrutiny of evidence known which could make prosecution unreasonable.

The appellant could not rely on a full and fair disclosure to counsel as a defense in this case. It has quite properly not asserted that this case should be reversed because of undisputed evidence that it made such a disclosure to counsel. We are not creating a straw man to be knocked down by reciting that there was no such disclosure. Rather, the point is that in assessing the reasonable belief of the appellant the jury could consider not only Ms. Hoppis's testimony identifying the appellee as the person who signed the check but the other information as well in deciding

whether there was probable cause.

We hold the appellant was not entitled to a directed verdict as a matter of law.

## 2. The instruction

We do not disagree with the appellant's assertion that if the jury had found that the appellee was guilty of the offenses with which she was charged the appellant would have established a defense to her claim. *See* Restatement (Second) of Torts § 657 (1977). However, the instruction offered by the appellant was insufficient to permit the jury to reach any such conclusion, as it did not state the elements of the offenses with which the appellee had been charged. We do not question the statement in the appellant's reply brief that in considering this defense the jury need not find that the appellee was guilty of each element of the offenses beyond a reasonable doubt. However, if the jury is to consider her guilt or innocence using the preponderance of the evidence standard, it surely must be instructed on the elements of the offenses.

The appellant also argues that the jury was informed of the basis of the charges by the deputy prosecutor. The pages in the record to which the appellant refers contain the testimony of Mr. Douglass explaining why he would not have filed the charges had he known all the facts known to Mr. Butler. While there is some discussion about how the offenses of false swearing and theft by deception go hand in hand but are separate criminal acts, the discussion there is woefully short of explaining to the jury the elements of the offenses.

## 3. The damages

The jury initially awarded the appellee compensatory damage of $5,000 plus punitive damages of $150,000. The trial judge gave the appellee a choice of accepting a remittitur of $75,000 or a new trial. The appellee accepted the $75,000, and the judgment was for that amount plus the compensatory damages. We are asked to hold that the punitive award is so excessive, in comparison with the compensatory award, as to shock the conscience of the court. We decline to do so.

There is no fixed standard for the measurement of

punitive damages, and even if the proportionality of punitive damages to compensatory damages is an appropriate consideration, it is only one such consideration among others equally important. *Ray Dodge Inc.* v. *Moore*, 251 Ark. 1036, 479 S.W.2d 518 (1972). Another consideration which may be weighed by the jury, as was done in this case, is the net worth of the defendant (appellant). *Matthews* v. *Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983). Given the evidence of malice, including the appellant's decision to proceed with the prosecution after having been advised against it by one deputy prosecutor, the failure to disclose all the facts to the second deputy prosecutor, and its persistence in the case even after its dismissal by the municipal court, which could have been considered by the jury, we cannot say punitive damages were generally improper in this case. Nor can we say the amount shocks the conscience of the court.

Affirmed.

HAYS, J., not participating.