S.G. CATLETT, d/b/a King's Inn *v.* Fred STEWART, Lee
Ann Stewart, and Steaven E. Miller

90-78                                        804 S.W.2d 699

Supreme Court of Arkansas
Opinion delivered February 25, 1991

638

*Huckabay, Munson, Rowlett & Tilley*, by: *Beverly A. Rowlett*, for appellant.

*Kaplan, Brewer & Maxey*, by: *Philip E. Kaplan* and *Silas H. Brewer, Jr.*, for appellees Fred and Lee Ann Stewart.

*Wilson, Engstrom, Corum & Dudley*, by: *Timothy Dudley*, for appellee Steaven E. Miller.

DONALD L. CORBIN, Justice. Appellant, S.G. Catlett d/b/a King's Inn, appeals the denial of its motion for directed verdict in a jury trial which resulted in an award of damages to appellees Fred Stewart, Lee Ann Stewart, and Steaven E. Miller. We find no error and affirm.

The action arose out of a shooting that occurred February 9, 1986, on the premises of the King's Inn in Searcy, Arkansas. Merle Fritts, the husband of Erma Fritts who was an on-duty employee of the appellant, shot the appellees following a domestic dispute with his wife. Appellees filed a negligence suit against appellant claiming that appellant had a duty of care to act reasonably in this situation and that appellant breached that duty vicariously through his employees. Appellant argued there was no duty owed to appellees or, in the alternative, the duty was satisfied by the actions taken by the employees. After receiving instructions relating to an ordinary duty of care, the jury returned a verdict awarding damages to appellees.

Appellant makes but one assignment of error in this appeal and that is the trial court's failure to grant its motion for directed verdict. That is the sole issue before us. Because this case is somewhat confusing, perhaps it is equally important to state what

appellant does not assign as error. Appellant does not challenge the giving of certain jury instructions regarding a duty of care.

Because, however, the concept of duty makes a peculiar appearance in this case, we feel it is important to relate some events that occurred at trial. After an objection by appellant to the giving of jury instructions relating to a duty of care, the trial judge made his determination of law that an ordinary duty of care was owed in this case. Because there was indeed a duty owed here, the trial judge was correct in denying the motion for directed verdict and then presenting the case to the jury for its determination of the various factual elements. The language of *Adams* v. *Browning*, 195 Ark. 1040, 115 S.W.2d 868 (1938), regarding the jury's task of making factual determinations, was cited with approval in *Pitts* v. *Greene*, 238 Ark. 438, 382 S.W.2d 904 (1964), and bears repeating here:

> "Under our system of jurisprudence, it is the province of the jury to pass upon the facts. It is not only their privilege but their right to judge of the sufficiency of the evidence. The credibility of the witnesses, the weight of their testimony, and its tendency, are matters peculiarly within the province of the jury. If there is any substantial evidence it is the duty of the court to submit the matter to the jury."

*Pitts*, 238 Ark. at 441, 382 S.W.2d at 906.

That is what occurred in this case. The judge made a determination of law that appellant owed appellees an ordinary duty of care to act reasonably under the circumstances. The judge proceeded to instruct the jury on the remaining factual elements of negligence, and the jury rendered its verdict accordingly. Thus, the task before us in this case is to review the record, as it is presented to us by the parties and described in the preceding paragraph, and determine if there is sufficient evidence to support the jury's verdict.

■■ An appeal of a denial of a motion for a directed verdict is considered a challenge to the sufficiency of the evidence. Our standard of review in this situation is quite high indeed. We view all the evidence in the light most favorable to appellees, and if there is any evidence sufficient to warrant the verdict, we affirm

the trial court's refusal to direct a verdict. *First Commercial Bank, N.A.* v. *Kremer*, 292 Ark. 82, 728 S.W.2d 172 (1987).

■ Generally, the facts of this case are not disputed by the parties. Rather, it is the interpretation of the facts that is disputed here. A review of the facts and all the evidence presented at trial as viewed most favorably to appellees reveals that there is sufficient evidence to support the verdict. Accordingly, we affirm the trial court's refusal to grant a directed verdict.

The evidence reveals that Merle and Erma Fritts were married in 1983. Merle later became disabled by a heart attack and subsequent back surgery. Thereafter, he began to drink heavily. According to Erma, while he was drinking he was continually hitting her. On one occasion, he threw beer in her face and verbally abused her, forcing her to run to a neighbor's home while he roamed outside with a gun. On another occasion, Merle choked Erma with such force that she had to seek medical treatment.

Merle Fritts appeared at the King's Inn at about twenty minutes before 7:00 a.m. on the day of the shooting. He had a conversation with Nancy Blackshire, who was on duty as the desk clerk. Erma was scheduled to relieve her at 7:00 a.m. Ms. Blackshire testified that she could smell liquor on Merle's breath. Prior to that morning, Erma told Ms. Blackshire that Merle drank heavily and that she was afraid of him when he was drinking. Ms. Blackshire was also aware of the parties' divorce action.

Erma arrived at work at the King's Inn at approximately 6:50 a.m. She observed that Merle appeared to be drunk or that something was wrong with him. She said she was not fearful until Merle indicated he was going to grab her by the hair of her head and drag her out of the motel. She said he had a wild appearance when he made this threat. He also threatened to blow her head off. She testified that she then asked Dub Throckmorton, manager of the restaurant next to the motel lobby and a life-long friend of Merle's, to invite Merle in for coffee and to talk to him. She testified that she could have "eased in the back and used the phone but I didn't think nothing about that."

Throckmorton saw that Merle was angry and obviously

intoxicated. He knew from previous experience that Merle was a troublemaker when he had been drinking. He said Erma asked him to call the police, but he did not because he thought she should. After Merle threatened to blow Erma's head off, he talked with Merle for about twenty minutes. Each time he thought he had Merle calmed down, Erma would interject a remark that would again anger Merle, causing him to become more vulgar and abusive.

At about 7:20 a.m., after Throckmorton's attempts to calm Merle, Merle left the restaurant, got a shotgun from his truck, and returned to the motel. Throckmorton observed Merle's movements and asked appellee Fred Stewart, who was drinking coffee in the restaurant, to help him stop Merle. Stewart agreed and gave Throckmorton the telephone number of the police department. Merle entered the motel lobby and began shooting, severely injuring Fred Stewart and Steaven Miller. Throckmorton called the police who arrested Merle shortly after their arrival.

Twelve reasonable jurors, who lived in the community where the shooting occurred, acting under the instructions by the court, reached the reasonable conclusion that Erma Fritts did not meet her duty to exercise ordinary care to prevent the harm from occurring, a harm that in their judgment a reasonable person should or could have foreseen.

Generally, if there is any conflict in the evidence, or we find the evidence is not in dispute but is in such a state that fair-minded people might have different conclusions, then a jury question is presented, and a directed verdict will be overturned. *Moore Ford Co.* v. *Smith*, 270 Ark. 340, 604 S.W.2d 943 (1980). It follows that the reverse is also true; if there is evidence about which fair-minded people might make different conclusions, then a jury question is presented and a denial of a motion for directed verdict will be affirmed. When applying the law set out above to the aforementioned factual situation in this case, we are unable to say there is no evidence of negligence on appellant's part to support the jury's verdict. Accordingly, we hold that, based on the evidence presented and instructions given to the jury, there was sufficient evidence to support the verdict for appellees. We therefore affirm the trial judge's denial of appellant's motion for

directed verdict.

## ANALYSIS OF NEGLIGENCE

■ The question of what duty, if any, appellant owed to the appellees is answered as early as the case of *Ford* v. *Adams*, 212 Ark. 458, 206 S.W.2d 970 (1947), where we recognized that a hotel is not an insurer of the safety of its guests, but that it is charged with the duty of taking all precautions for the protection of its guests which reasonable prudence and ordinary care would suggest. There, we established that as a matter of law the appellant hotel owed a duty of ordinary care to the appellees. Given the facts of this case, it is clear appellant owed appellees a duty of ordinary care.

The determination of the remaining factual elements were within the province of the jury. *See Stacks* v. *Arkansas Power and Light Co.*, 299 Ark. 136, 771 S.W.2d 754 (1989); *Keck* v. *American Employment Agency*, 279 Ark. 294, 652 S.W.2d 2 (1983), (questions of causation and foreseeability may be questions of fact); *Linxwiler* v. *El Dorado Sports Center*, 233 Ark. 191, 343 S.W.2d 411 (1961), (the determination of the satisfaction of a duty of care is a question for the jury).

■ With respect to the foreseeability issue, appellant argues it was unforeseeable that Merle Fritts would act as he did on the morning in question. Appellees argue, on the other hand, it is not necessary that the particular kind of harm be foreseen. We agree with appellees. We held in *Bergetz* v. *Repka*, 244 Ark. 60, 63, 424 S.W.2d 367, 369 (1968) that:

> "It is not," . . . "necessary that the particular injury should have been foreseen. . . . 'Doubtless the particular situation might not have been foreseen, but this was not essential to making out a charge of negligence. Accidents as they occur are seldom foreshadowed; otherwise many would be avoided. If the act or omission is of itself negligent and likely to result in injury to others, then the person guilty thereof is liable for the natural consequences which occurred, whether he might have foreseen it or not.' "

Clearly, the fact that Erma Fritts did not foresee that Merle Fritts would use a gun and harm other people did not resolve the issue of Erma's negligence. Her negligence is properly measured

by whether a reasonable person would have foreseen a risk of harm in Merle's conduct.

## FIREMAN'S RULE

■ Within their argument, appellant argues that the "fireman's rule" is applicable to appellee Stewart. This rule merely holds that fire fighters and police officers who enter premises in the execution of their official duties do so as licensees, under a privilege conferred by legal authority, usually under circumstances of emergency. *Prosser and Keeton on the Law of Torts*, § 61, pp. 429-431 (5th ed. 1984). We have not adopted this rule in Arkansas. Fred Stewart, in contrast, entered the King's Inn on February 9 as a private citizen and business customer of the restaurant, for the purpose of drinking coffee, reading a magazine, and meeting friends, as he was accustomed to doing several times each week. Although Mr. Stewart was a constable for the city of Kensett, Arkansas, at the time of his injuries, his official authority and responsibilities did not extend beyond the limits of that township.

> (a) Each constable shall be a conservator of the peace in his township and shall suppress all riots, affrays, fights, and unlawful assemblies, and shall keep the peace and cause offenders to be arrested and dealt with according to law.

> (b) If any offense cognizable before a justice of the peace in his township is committed in his presence, the constable shall immediately arrest the offender . . . .

Ark. Code Ann. § 16-19-301 (1987).

■ Appellees contend that Fred Stewart had no legal authority or duty to arrest and restrain Merle Fritts, and his attempt to intercede when Fritts returned to the motel with a firearm was motivated entirely by humanitarian concerns, as the court properly instructed the jury. We agree.

Affirmed.

NEWBERN and BROWN, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. The majority result is troublesome in several respects. It finds a duty of care on Erma Fritts' part owed to the restaurant patrons, when Erma testified she "never dreamed" Merle Fritts would hurt anyone other than herself. It expands the duty owed to include a police officer who was acting in an official capacity. And, lastly, the effect of this decision may well be to force employers to eliminate employees with problem spouses from their employment. Employers will certainly begin to screen potential employees for spousal controversy.

The facts are set out by the majority, although I have added to them. Merle has a history of violent behavior toward Erma and was verbally and physical abusive toward her. On one occasion he threw a beer in Erma's face and called her "a bunch of names," and she took refuge in a neighbor's trailer. She testified that while she was in her neighbor's trailer, Merle was "marching outside with a gun." Another time, she said he choked me "real bad, and so I had my neighbors to take me to the doctor." On still another occasion he pushed her down on a dance floor. She admitted that her husband was dangerous where she was concerned.

On Friday, February 7, 1986, Erma filed for divorce against Merle, and the court issued a restraining order on that same date. Erma and Merle, however, spent the night together. The following night, Saturday, February 8, 1986, Erma and a female friend visited several clubs, avoiding those where Merle was likely to be. The next morning, Sunday, February 8, 1986, was the morning of the shooting.

At about 6:50 a.m. that morning, Erma arrived at her job as front desk clerk at the motel. Merle was waiting for her, and she observed that it "appeared that he was drunk or something was wrong with him." Merle first told her that she was "pretty this morning," but then accused her of having been "out with some men" the night before and threatened to pull her out of the motel "by the hair of the head."

Erma went across the motel lobby and into the adjoining restaurant to get help from Dub Throckmorton, who was leasing the restaurant from the motel owner, appellant S.G. Catlett. According to Throckmorton she asked him to "call the police, that Merle was threatening her." She also asked Throckmorton,

who was a friend of Merle's, to induce her husband to go to the restaurant for coffee "because I'm afraid he's going to cause me trouble in here." When Throckmorton intervened, Merle became belligerent, declaring, "You're not big enough to take me anywhere." He looked at Erma and said, "You see her. I'm going to kill her." This statement, however, did not "upset" Erma because "he had told me before he was going to kill me." Nevertheless, according to her testimony, she suggested to Throckmorton that perhaps he should "call the law on him." Throckmorton and Erma talked to Merle for twenty minutes, and Erma pleaded with him to leave. This only made him madder. Finally, they appeared to succeed, and Merle left the motel.

Other witnesses in the adjoining restaurant testified that during the 20 minutes or so of wrangling, Merle used other abusive and profane language. Appellee Fred Stewart, a constable for White County and a regular customer at the restaurant who was having his usual coffee that morning, testified that Merle pointed his finger at Erma and said, "You know I mean what I say. I'll blow your f——— head off." After making the remark, Stewart said Merle "turned and walked off." Stewart did not take the comment seriously. He said, "I thought they had a little problem."

Appellee Steaven Miller also heard the threatening language about blowing Erma's head off and chose to ignore it.

Throckmorton and Erma watched from the restaurant window as Merle walked to his truck. Throckmorton thought Merle appeared calm as he was leaving. Once he reached his truck, though, Merle opened the door, removed a shotgun, and began walking back toward the restaurant. Throckmorton at that point called on appellee Stewart for help. Stewart then described what happened:

> At that time, if I recall right, Dub [Throckmorton] was on the phone. I said, "call the police," and gave him the number, and he came over by me and I was taking my gun out of my boot, and he said, "Can you help?" And I said, "I'll try." We watched the man walk by here and I went out in the lobby here past these gates to stand at the corner right here to stop him before he got into the restaurant . . . . I stood here. I watched this man come in here. When

he got about four or five feet from me, I said, "Police officer, drop your gun." And the next thing I knew I was hearing a noise in my head like a loud banging noise . . . .

As a law enforcement officer in Arkansas, Stewart was authorized to carry a firearm. He testified that he felt a duty to act as a police officer to prevent violence. He further testified that "if you see a felony in progress anywhere you are going to have to take some action." He understood "somewhat" that he was undertaking a risk and voluntarily did so.

### Duty Owed

Our case law is clear that in any analysis of negligence we should answer the following questions:

1. What duty, if any, did Catlett owe to Stewart and Miller?
2. Was that duty breached?
3. Could Catlett have reasonably foreseen that such a breach would cause the injury suffered by Stewart and Miller?
4. Did the negligent act of Catlett cause the injury or was it a substantial factor in the cause of the injury?

*Keck* v. *American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983). In *Keck* we further said that "what duty is owed is always a question of law and never one for the jury." 279 Ark. at 298, 652 S.W.2d at 4; citing W. Prosser, *Law of Torts*, § 45. Questions of foreseeability and causation, however, may be ones of fact, depending on the case. *Id.* In *Keck* we found an employment agency negligent for making no check on one of its customers (Joiner) who abducted and raped a potential employee, Mrs. Keck. In analyzing that case we said, "If the agency could not have foreseen any risk in referring Mrs. Keck to Joiner, it was not negligent because negligence cannot be predicted on a failure to anticipate the unforeseen." 279 Ark. at 299, 652 S.W.2d at 5.

Here we are dealing with the unforeseen and the duty to protect restaurant patrons against the unforeseen. (And though it was not argued on appeal, it should be noted that the restaurant leased by Throckmorton is a separate legal entity from the motel owned by Catlett.) Erma did not owe a duty to Stewart and Miller

to protect them against her husband, when she had no inkling that they were in harm's way until it was too late.

This is not a case where the defendant argued that a particular injury was not foreseen and, accordingly, there should be no liability. *See Bergetz* v. *Repka*, 244 Ark. 60, 424 S.W.2d 367 (1968). Rather, it is a case where no one, including Erma and Throckmorton, foresaw the general potential for injury to patrons of the motel or restaurant which resulted from Merle's presence.

Erma's history with Merle never suggested that he might be a danger to persons other than herself. She was asked about this repeatedly at trial, so much so in fact that it raised an objection from counsel. In one exchange she said:

. . .

Q.   You knew also at that time that at your place of employment you had some special responsibility to others, didn't you, to those who were there doing business?
A.   Sir, I never dreamed of him hurting anybody else so, therefore, I didn't because I never thought about him being, getting anybody else.
Q.   Okay, so you never even thought about that?
A.   I sure didn't.

And all of the testimony at trial bore her out. She obviously foresaw no danger to others, but that could, arguably, be a subjective assessment. What confirms the objectivity of the assessment, however, is the fact that Merle's friend, Dub Throckmorton, who knew him well and who spent twenty minutes with him immediately before the shooting, did not foresee danger to third parties. Otherwise, he would have called the police. And, finally, neither of the appellees — and they had overheard Merle's abusive talk to Erma — foresaw a problem. Under the circumstances it is difficult to fathom how her personal experience with Merle fostered a duty to restaurant patrons when she never anticipated he would do such a thing and when, according to everyone who testified, he had never acted violently toward other parties before.

### Breach of Duty

Moreover, assuming Erma owed a duty to patrons of the restaurant, what more could she have done to satisfy that duty than what she did? She went to Merle's friend, Throckmorton, and asked that he call the police. She did not call the police herself but that is understandable when an abusive husband was watching her every move. She also asked Throckmorton to give Merle some coffee and try to get him to leave the premises. And she personally pleaded with Merle to leave for 20 minutes, placing herself in a fearful and embarrassing position in the process. She did everything that reasonably could have been expected under any objective standard.

### Duty Owed to Police Officer

What precipitated the tragic shooting was the bravery of appellee Stewart. By his own admission Stewart felt a duty to act as a law enforcement officer and was called on to act in that capacity by Throckmorton. He understood to some extent that he was placing himself at risk but voluntarily chose to do so. With this in mind he left the restaurant and went into the motel lobby where he confronted Merle with gun drawn and said: "Police officer — drop your gun." His actions were completely laudable and commendable.

Catlett took steps to assert a Fireman's Rule defense. He first asked for a directed verdict at the conclusion of appellees' case on the basis that by drawing his weapon and placing himself in Merle's path, Stewart was acting voluntarily as a law enforcement officer, and no duty was therefore owed him. The motion was denied. Catlett's motion was renewed at close of trial but also denied. Catlett further objected to one of appellees' requested instructions on the basis that Stewart was acting as a law enforcement officer and "his status as an invitee was severed when he assumed his duty. . . ." The instruction was given anyway by the trial court.

Arkansas has not formally adopted the Fireman's Rule, which, simply stated, renders public safety officers who enter upon the premises in their official capacities licensees to whom no duty is owed by the owner of the premises other than a duty to refrain from intentional, willful, or wanton misconduct. *Prosser*

*& Keaton on Torts*, § 61, p. 429 (5th Ed. 1984). I do not suggest that we generally adopt the Fireman's Rule today. However, appellees' primary claim of negligence against Catlett is his employee, Erma, was knowledgeable about Merle's dangerous propensities, and she failed to call the police herself. It seems inconsistent for one of the appellees, an activated police officer on the premises who intervened on Erma's behalf, to make this claim of negligence. What we have is a police officer, Fred Stewart, who is shot protecting Erma, arguing that she was negligent for not calling the police herself. This result is highly illogical.

Innkeepers do have a special relationship with their patrons and owe them a duty to exercise reasonable care. *Prosser & Keaton on Torts* § 61, p. 425 (5th Ed. 1984); *Anderson & Co. v. Diaz*, 77 Ark. 606, 92 S.W. 861 (1906); *Lopez* v. *McDonald*, 238 Cal. Rptr. 436, 193 Cal. App. 3d 495 ;(1987). But where dangers are so highly extraordinary or improbable as to be wholly beyond the range of expectability, the liability of the innkeeper should not attach. *See Jones* v. *Leon*, 3 Wash. App. 916, 478 P.2d 778 (1970). Who best would know about the high improbability of what Merle did other than Erma, his wife, and his friend, Throckmorton? High improbability is exactly what we have in this case. Under such circumstances no duty is owed the restaurant patrons. *Id.*

Moreover, the duty a landowner owes to his invitees is not absolute, and it does not extend to conditions where an unreasonable risk cannot be anticipated. *Restatement (Second) Torts* § 343A, p. 218; *Prosser & Keaton on Torts* § 61, pp. 425-427 (5th Ed. 1984).

There is, too, an important public policy consideration here which the majority fails to consider. We are telling employers by this decision that they must examine the private lives of their employees to avoid liability. That places an incredibly heavy burden on restaurant owners who now must make the investigation into potential spousal abuse of their employees and an even heavier burden on the employees themselves who might lose their jobs in the process.

## Motion for Directed Verdict

Appellant Catlett moved for a directed verdict at the close of appellees' case and at the close of his defense as well. The trial court denied the motion. In reviewing a trial court's decision on directed verdict motions, we have held that we must give the evidence of the prevailing party its strongest probative force in determining whether a jury question exists on the negligence issue. *See Dawson* v. *Fulton*, 294 Ark. 624, 745 S.W.2d 617 (1988); *Harper* v. *Mo. Pac. Rd. Co.*, 229 Ark. 348, 314 S.W.2d 696 (1958). In a subsequent case the Arkansas Court of Appeals has said, ". . . a directed verdict is proper only when the evidence is so insubstantial as to require that a jury verdict for the non-moving party be set aside." *Prudential Ins. Co.* v. *Williams*, 15 Ark. App. 94, 96-97, 689 S.W.2d 590 (1985). In *Williams* the focus on appeal was whether there was substantial evidence to support plaintiff's loss of sight independently of cataract surgery. Whether evidence is substantial or not is a question of law. *Findley, Adm'x* v. *Time Ins. Co.*, 269 Ark. 257, 599 S.W.2d 736 (1980). The court of appeals, in *Williams*, went on to define substantial evidence as:

> '. . . evidence that is of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or the other. It must force or induce the mind to pass beyond a suspicion or conjecture.' Ford on Evidence, Vol. 4 § 549, page 2760. Substantial evidence has also been defined as 'evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent references.'

15 Ark. App. at 97, 689 S.W.2d at 592, quoting *Findley, Adm'x* v. *Time Ins. Co.*, 269 Ark. 257, 599 S.W.2d 736 (1980) and *Pickens-Bond Constr. Co.* v. *Case*, 266 Ark. 323, 584 S.W.2d 21 (1979). The issue presented to the trial court was whether the hemorrhage causing the loss of sight resulted from the surgery or not. The trial court refused to direct a verdict for the defendant, and the court of appeals reversed, concluding that the plaintiff's evidence raised nothing more than suspicion in the jurors' minds.

The administration of rules of law and the determination of facts upon which there could be no reasonable difference of opinion are matters left to the courts. *Prosser & Keaton on Torts* § 45, pp. 319-320 (5th Ed. 1984). In three foreign jurisdictions where assaults occurred on a landowner's premises the appellate courts sustained either a directed verdict or judgment n.o.v. in favor of the defendant landowner. *People* v. *Lodge*, 418 N.W.2d 381 (Mich. 1988); *Harvey* v. *Van Aelstyn*, 319 N.W.2d 725 (Neb. 1982); *Jones* v. *Leon*, 3 Wash. App. 916, 478 P.2d 778 (1970).

The *Jones* case most closely approximates the facts in this case. A boyfriend (Bird) had slapped his girlfriend (Vicki) in a tavern two weeks before the shooting in question, and the tavern owners knew it. Vicki told Bird that she no longer wished to continue the relationship, and Bird proceeded to get intoxicated. Vicki went to a restaurant where she once worked as a part-time barmaid and told the manager to call the police, if he saw Bird. She also told the manager that Bird had threatened to kill her. Bird entered the restaurant later that evening, saw Vicki dancing with the plaintiff, and after a brief conversation shot the plaintiff. The Washington Court of Appeals affirmed the trial court's directed verdict and noted that Bird had a violent temper. The court then continued:

> However, the term "violent temper" is not precise, but one of degree. We do not believe it can be inferred from this incident that Bird's temper was so violent and uncontrollable that it was reasonably foreseeable to the respondents that he would use a gun under similar circumstances. There is no evidence, nor inference from evidence, that respondents had knowledge of any propensity of Bird to use a gun.

478 P.2d at 783. The same reasoning should apply to this case.

There was ample proof that Merle was dangerous as far as Erma was concerned but no proof that he was dangerous to others. His shooting appellees was wholly unexpected by Erma and Throckmorton, who knew him best and who visited with him for twenty minutes before the shooting. There is no duty of care where the wholly unexpected is involved. And that is what occurred. Here the evidence introduced to prove Merle's propen-

sity to harm others does not rise above the level of conjecture and suspicion.

I would reverse on grounds that the trial court erred in failing to direct a verdict in favor of the appellant Catlett. The duty of care owed to appellees by Catlett was simply not established under the facts of this case.

NEWBERN, J., joins in this dissent.