ROBERTSON OIL COMPANY, INC., Plaintiff,

v.

PHILLIPS PETROLEUM COMPANY, Defendant.

Civ. No. 86–2120.

United States District Court, W.D. Arkansas, Fort Smith Division.

Nov. 5, 1991.

Julius Glickman, Glickman & Barnett, Houston, Tex., William R. Wilson, Jr., Wilson, Engstrom, Corum & Dudley, Little Rock, Ark., for plaintiff.

Neal Lehman, Phillips Petroleum Co., Bartlesville, Okl., Robert Jones, Jr., Jones, Gilbreath, Jackson & Moll, Fort Smith, Ark., Theodore B. Olson, Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher, Washington, D.C., William H. Sutton and Kevin A. Crass, Friday, Eldredge & Clark, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, District Judge.

This case is before the court for the third time. Plaintiff's complaint, filed in 1986, asserted numerous causes of action against Phillips Petroleum Company, and, in 1987, a jury awarded plaintiff $750,000 in actual damages and $5,000,000 in punitive damages. The court then entered judgment on the verdicts. In 1989, the Eighth Circuit Court of Appeals affirmed the judgment with respect to the compensatory award, but reversed the punitive award and remanded for a new trial on plaintiff's claims for negligence and fraud and on the prayer for punitive damages. *See Robertson Oil Company, Inc. v. Phillips Petroleum Co.,* 871 F.2d 1368 (8th Cir.1989).

The following year, on retrial, a jury found for plaintiff on his claim for fraud and assessed punitive damages against Phillips in the amount of $4,000,000 on plaintiff's claim for intentional interference with contract and $4,000,000 on plaintiff's claim for fraud. On appeal, the Eighth Circuit affirmed this court in all aspects of the trial proceedings, but remanded the case for the limited purpose of reviewing the punitive damage verdicts in light of the Supreme Court's ruling in *Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) *(Haslip).* *See Robertson Oil Company, Inc. v. Phillips Petroleum Co.,* 930 F.2d 1342 (8th Cir.1991) *(Robertson II).* The Eighth Circuit ordered the court to "articulate its analysis under Arkansas law and to review the award under the criteria approved in *Haslip* ... as well as principles enumerated in the Arkansas cases." *Robertson II,* 930 F.2d at 1347.

### I.

■ Under the law of the state of Arkansas, a trial court should allow an award of punitive damages to stand unless its amount " 'shocks the conscience of the court or demonstrates that jurors were mo-

tivated by passion or prejudice.'" *O'Neal Ford, Inc. v. Davie,* 299 Ark. 45, 49, 770 S.W.2d 656, 659 (1989), quoting from *W.M. Bashlin Co. v. Smith,* 277 Ark. 406, 423, 643 S.W.2d 526, 534 (1982). The first question that the court must address is whether these review criteria can pass muster under the reasoning in *Haslip.* It needs emphasizing that *Haslip* did not hold that the procedures that it approved, devices that the Alabama courts had developed over the years, are the minimum ones that the due process clause requires. Rather, the Court was careful to say simply that the Alabama procedure is constitutional because it "ensures meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages." *Haslip,* —— U.S. at ——, 111 S.Ct. at 1044.

In a case similar to the instant one, the Eighth Circuit expressed some reservations about the constitutionality of the Arkansas post-verdict review processes, *see Union National Bank of Little Rock v. Mosbacher,* 933 F.2d 1440 (8th Cir.1991), because the Arkansas Supreme Court has asserted that "'[c]onsiderable discretion is given to the jury in fixing punitive damages in an amount it deems appropriate to the circumstances.'" *Id.* at 1448, quoting from *Walt Bennett Ford v. Keck,* 298 Ark. 424, 429, 768 S.W.2d 28, 31 (1989). This court believes, however, that the Arkansas shock-the-conscience standard is not nearly so vague, elastic, and subjectively visceral as it might at first appear.

In the first place, this very standard has been employed by courts for as long as we have been a country, for it appeared in early equity cases where the chancellor was asked to set aside a bargain on the ground that consideration was grossly inadequate. *See, e.g., Underhill v. Horwood,* 10 Ves.Jun. 209, 32 Eng.Rep. 824 (1804), and *Coles v. Trecothick,* 9 Ves.Jun. 233, 32 Eng.Rep. 592 (1804), both cited and followed in *Eyre v. Potter,* 56 U.S. (15 How.) 42, 59–60, 14 L.Ed. 592 (1853). The same collection of words has since done reputable duty in a wide variety of contexts, serving, for instance, to evaluate the constitutionality of pumping a suspect's stomach to obtain swallowed drugs, *see*

*Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), or, generally, as a measure of what the fifth and fourteenth amendments to the Constitution require. *See, e.g., Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (cruel and unusual punishment); and *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (blood tests). The shock-the-conscience criterion has even been employed in considering whether the contract clause of the Constitution has been violated. *See Gelfert v. National City Bank,* 313 U.S. 221, 61 S.Ct. 898, 85 L.Ed. 1299 (1941), and *Home Building and Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

The long and distinguished history of the Arkansas standard bears testimony to its utility and constitutionality. It is important, too, that that standard evidently has its genesis in a context in which the asserted unfairness of an act was resolved with reference to a relatively quantitative question, namely, whether an amount of money was grossly in excess of some other sum that could be determined with relative certainty. While the abstractly correct amount of punitive damages in any situation cannot be ascertained with a mathematical precision, the Arkansas standard is not nearly so subjective as defendant urges.

Secondly, an examination of the Arkansas cases reveals that the Arkansas Supreme Court has given its standard a rather definite shape and texture, for it has engaged in a number of rather specific inquiries under the aegis of its general standard. For example, the court has examined the relationship between the relevant parties, the ratio of the punitive award to the compensatory award, the extent and duration of a defendant's acts, the deliberateness of the defendant's acts in the face of no justification for them, the defendant's motives, the defendant's remorse, if any, the defendant's net worth, and other matters, in order to judge the propriety of a punitive award. *See Walt*

*Bennett Ford, Inc. v. Keck,* 298 Ark. 424, 768 S.W.2d 28 (1989); *First Commercial Bank v. Kremer,* 292 Ark. 82, 728 S.W.2d 172 (1987); *Twin City Bank v. Isaacs,* 283 Ark. 127, 672 S.W.2d 651 (1984); *Pursley v. Price,* 283 Ark. 33, 670 S.W.2d 448 (1984); *Matthews v. Rodgers,* 279 Ark. 328, 651 S.W.2d 453 (1983); *Ray Dodge, Inc. v. Moore,* 251 Ark. 1036, 479 S.W.2d 518 (1972); *Holmes v. Hollingsworth,* 234 Ark. 347, 352 S.W.2d 96 (1961); *Vogler v. O'Neal,* 226 Ark. 1007, 295 S.W.2d 629 (1956); *McGlone v. Stokes,* 193 Ark. 1008, 104 S.W.2d 191 (1937); *St. Louis Southwestern Railway Co. v. Hagler,* 160 Ark. 543, 254 S.W. 1071 (1923); *Gordon v. McLearn,* 123 Ark. 496, 185 S.W. 803 (1916); and *Pine Bluff and Arkansas River Railway Co. v. Washington,* 116 Ark. 179, 172 S.W. 872 (1915). Under these circumstances, a party that argues that the Arkansas procedure, as actually practiced, lacks a discernible perimeter or possesses insufficient form to pass constitutional muster has a difficult burden to carry. The court is clear that the review procedure "ensures meaningful and adequate review by the trial court," *Haslip,* —— U.S. ——, 111 S.Ct. at 1044, and thus satisfies the due process clause.

Finally, it needs to be said that despite the moral skepticism of our age, its fascination with utilitarianism, and its tendency to apotheosize the work of the counting sciences, judging still requires judgment. Using judgment is not, as Holmes remarked in another context, a duty; it is merely a necessity. That there is some risk inherent in the enterprise does not distinguish it from any other human undertaking and cannot excuse a refusal to engage in it.

## II.

■ The court turns now to an application of the criteria developed by the Arkansas Supreme Court. In our case, not merely one jury but two, each composed of twelve people, have unanimously concluded that it was appropriate to award punitive damages in relatively similar amounts against defendant, a circumstance that itself must naturally produce reluctance on the part of the court to disturb the relevant findings. The juries, on sufficient proof, have found that Phillips committed two intentional torts against plaintiff, one of them fraud. The court held that a finding of fraud would, without more, support an award of punitive damages; and in any case, both torts were intentional, a fact that in and of itself, under relevant Arkansas rulings, cuts against Phillips's contentions. Then, too, the ratio of punitive damages to compensatory damages, about ten to one, does not by itself suggest excessiveness, especially in light of Phillips's huge net worth of $2,000,000,000. *See* especially *Matthews,* 279 Ark. at 336–37, 651 S.W.2d at 458.

A few words about the relevance of net worth in these kinds of cases seem appropriate here. It is true, as this court has noted in other cases, that reference to net worth in determining the propriety of a penalty has been criticized as a denial of the equal protection of the law. Indeed, as an original proposition, it is fairly arguable that taking net worth into account when assessing a fine is a violation of the judicial oath to do equal justice to rich and poor. It has also been urged, on a somewhat more scientific plane, that it is not demonstrable that a marginal dollar is worth less to a billionaire than it is to a pauper, that, in other words, despite the diminishing marginal utility of money (or anything else) to everyone, there is no reliable method of making interpersonal utility comparisons. *See* R. Posner, *Economic Analysis of Law* 344–46 (2d ed. 1977). But we are, in our juridical history, now well past the point of relying on these arguments for excluding evidence of net worth, for they have been universally rejected, due partly to their counter-intuitive character.

■ It is not, however, in the court's view, improper for a defendant to make these arguments to a jury or to frame questions based on them for a plaintiff's expert. In other words, a defendant may urge these logical and moral propositions on the fact finder in an attempt to reduce the weight that the fact finder may give to the defendant's net worth. In fact, in this very case defendant's able counsel argued that net worth was not a datum upon which

one could equitably base a punitive damage award, by effectively putting the case of an overparked vehicle that might, if that criterion were applied, draw a fine to Phillips of a million dollars or more. The court itself, moreover, on cross-examination of defendant's expert economist, elicited from him an admission that interpersonal utility comparisons are impossible to draw accurately.

Nor can the court reasonably conclude that the amount of the award evidences passion or prejudice on the part of the jurors. The court knows full well that oil companies may be the object of irrational envy and class bias. But, in the first place, the court did not even allow evidence of net worth into evidence until the jury had made a finding of liability and fixed a compensatory amount. This is a procedure that the court uses invariably in an attempt to reduce the effects, if any, of anti-capital prejudice. Secondly, plaintiff's counsel never once resorted to populist rhetoric and, though he was certainly a vigorous and effective advocate, at all times comported himself in a polite and appropriate manner. Nor did the court observe any overt manifestations of anger or irrationality in the behavior of the jury. In the circumstances, the court would have to resort to raw speculation to overturn or reduce the relevant awards on the basis that they were animated by passion or prejudice. That, of course, the court refuses to do.

Finally, it is noteworthy that while plaintiff's case was not remarkably obvious—indeed it seemed to the court rather thin in some respects—defendant's principal witnesses were nervous and uncertain in the extreme, so much so that a reasonable fact finder could have thought them deliberately evasive and could have concluded that they had guilty minds. The court is far from saying, of course, that such a conclusion was required, but plaintiff's case was well past the line that distinguishes the submissible case from the unsubmissible one.

### III.

■ The court's attention has been called to the holding in *Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 278–79, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989), which seems to indicate that a district court sitting in diversity should apply federal law in reviewing a jury's verdict. *But see id.*, 492 U.S. at 280, 109 S.Ct. at 2923 (district court "applied the proper state-law standard in considering whether the verdict returned was excessive"). The application of Fed.R.Civ.P. 59(a) to this case, however, would not produce a different result, since federal courts, like the Supreme Court of Arkansas, ask whether "the proceedings have been tainted by appeals to prejudice" or whether the verdict " 'shocks the conscience of the court.' " *See* 11 C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 2807 at 51–52 (1973). The court's analysis, therefore, would be the same regardless of whether it employed state or federal law.

### IV.

For the reasons adumbrated, the court declines to vacate the judgments.